**UNITED STATES of America, Appellee,**

v.

**Pasquale PAGANO, Defendant-Appellant.**

**No. 336, Docket 23549.**

United States Court of Appeals Second Circuit.

Argued June 9, 1955.

Decided July 5, 1955.

J. Edward Lumbard, U. S. Atty., for the Southern Dist. of New York, New York City (Dennis C. Mahoney, Asst. U. S. Atty., New York City, of counsel), for appellee.

Bernard Tompkins, New York City (Vincent J. Velella, New York City, of counsel), for defendant-appellant.

Before CHASE and MEDINA, Circuit Judges, and RYAN, District Judge.

MEDINA, Circuit Judge.

This case involves another one of those cumulative sentences which we have so often criticized, but which we have no power to reverse in the absence of a finding of error in the conduct of the trial. United States v. Chiarella, 2 Cir., 1950, 184 F.2d 903, 911. Count IV of the indictment charges appellant, one Mauro and others with conspiracy, during the period from June 1 through June 23, 1954, to offer a bribe and to bribe an Internal Revenue employee; Count II charges appellant with the substantive offense of offering a bribe on June 22, 1954; and Count III charges appellant and Mauro with the substantive offense of paying a bribe on June 23, 1954. Mauro pleaded guilty and testified for the government. The jury found appellant guilty on all counts, and the court imposed the maximum sentence of five years for the conspiracy and two maximum sentences of three years each on the substantive charges, to run concur-

rently, or eight years in all. As will appear shortly, "the counts are merely variants of a single criminal transaction"; and these cumulative sentences have been imposed in the very teeth of our repeated admonitions. We are accordingly required to direct a new trial, "unless the whole trial was conducted with the most scrupulous exactness." Amendola v. United States, 2 Cir., 1927, 17 F. 2d 529, 530.

In May of 1954 Frank P. McSweeney, who died before the trial, was a Special Agent of the Intelligence Division of the Internal Revenue Service, and his superiors assigned him to investigate the income tax liability of appellant, then a business agent for Mason Tenders Local No. 59, International Hod Carriers Union, A. F. of L. Having received a letter asking him to appear at the offices of the Internal Revenue Service at 253 Broadway, New York City, appellant went there on June 1, 1954 and was questioned by McSweeney. When the questions turned to certain trips to Europe in 1951 appellant terminated the interview and left. Shortly thereafter, according to appellant's testimony he mentioned his "problem" to his uncle John Pagano and to his uncle's friend Puppy, who recalled that Mauro, who was in fact a file clerk in the Internal Revenue Service at 253 Broadway, "works for the Internal Revenue." The upshot was that the three, appellant, the uncle and Puppy, met Mauro on Third Avenue and 116th Street in New York City, where Puppy introduced Mauro to the others and Mauro was shown the letter requesting appellant's appearance and he promised to get in touch with McSweeney, which he did.

On June 22, 1954, appellant had a conversation with McSweeney in conference room 317 at the office of the Internal Revenue Intelligence Division at 253 Broadway. Inspector John J. O'Neill and Inspector Howard T. Moran, having installed a listening device, were in the next room, and each of them testified that, after certain preliminary observations about the information appellant

would be required to furnish relative to his net worth and his trips to Europe, appellant "told McSweeney that he had $500 for him to fix the case, $300 of which would be delivered by Mauro the following day, June 23rd, and $200 * * * within two weeks." The next day Mauro delivered to McSweeney an envelope containing $300 in cash, whereupon he, and later appellant, were arrested and indicted.

■ There was thus ample evidence to justify the submission of all three counts to the jury. Indeed, the record as a whole quite plainly indicates appellant's guilt. The mere fact that Mauro toned down some of his testimony, and denied that appellant authorized him to give any money to McSweeney, is of no consequence. With the testimony of the two inspectors and the uncontradicted evidence of the delivery of the money to McSweeney as a foundation, the jury were fully justified in fitting the other aspects of the case, including the testimony of Mauro and appellant concerning the various meetings at the corner of Third Avenue and 116th Street, into the pattern of a conspiracy to bribe an Internal Revenue Agent, and in finding that there was both an offer to bribe and the payment of a bribe.

■ Nor is there any merit in the contention that "it was irrefutably established that on or before June 16th no conspiracy to bribe McSweeney was in existence." A conversation between Mauro and McSweeney on June 16th is alleged in the indictment as an overt act, and the argument is that Mauro's testimony indicates that at that time he had no idea of bribing McSweeney and hence the jury were permitted to find conspiracy on the basis of an alleged overt act which occurred before the conspiracy was formed. But the jury may not have believed this particular part of Mauro's testimony and it does not require an especially acute intelligence to probe through this more or less natural disclaimer and to give weight to the fact that Mauro, a file clerk in the Internal Revenue Service, with no background of personal acquaintance with appellant, should have been selected to go to see McSweeney, that the meetings were held in the street, near Mauro's home, and that Mauro is the man who turned up with the money just as appellant said he would. It is elementary that no direct proof of agreement is essential in these conspiracy cases and that the evidence taken as a whole is the proper basis for the drawing of the necessary inferences. The jury were warranted in finding that the conspiracy was already formed and in operation at the time of Mauro's first visit to McSweeney. Moreover, the court instructed the jury that the question of appellant's participation in any conspiracy must be decided on the basis of what appellant himself did and said, and that the jury could properly consider the declarations and acts of Mauro only after they had first found that there was a conspiracy and that appellant was a participant therein.

In fact the charge was conspicuously clear and in all respects accurate. Couched in language which laymen might easily understand, rather than in words culled from the opinions of appellate courts, which, torn from their context, often form a confusing amalgam, the instructions covered each and every issue with complete fairness and impartiality. The scales were held precisely in balance.

It is claimed that appellant was deprived of a fair trial by numerous rulings which are said to present a series of errors. We shall examine them in the order in which they are argued in appellant's brief:

■ (1) Mauro was permitted to testify on direct examination, over objection, that he had pleaded guilty to the conspiracy charge; and we are told that the prosecutor's statement in summation, asking the jury "in considering and evaluating the effect of his (Mauro's) testimony to keep in mind that he had pleaded guilty to the conspiracy charge," was in effect an argument that Mauro's

plea of guilty was some evidence of appellant's guilt. But the record makes it clear that Mauro's plea was received for its bearing on Mauro's credibility as a witness, which was proper, even on direct examination; such was the purport of the prosecutor's comment on summation; and the trial judge specifically warned the jury against considering Mauro's plea of guilty as in any sense proof of appellant's guilt.

■ (2) It is claimed that questions addressed to appellant's character witnesses relative to his arrest in New Jersey on April 22, 1952, for atrocious assault and to his indictment in the Southern District of New York on July 30, 1954, for conspiracy to violate the narcotics laws, "were drummed into the minds of the jurors by repeated propounding to every one of these six witnesses." But a closer scrutiny of the sequence of events makes it quite clear that, within the Supreme Court ruling in Michelson v. United States, 1948, 335 U. S. 469, 69 S.Ct. 213, 93 L.Ed. 168, there was no abuse of discretion.

The questions addressed to the first character witness were obviously proper. This witness testified on direct examination that he had "never" heard anything bad about appellant. The cross-examination, omitting counsel's elaborate objections and argument, covered less than one-half page of the printed record. Thereafter appellant's counsel chose to take the initiative by introducing the subject of arrests as part of his direct examination of the next five character witnesses. It was under these circumstances that the prosecutor pursued the subject and elicited the fact, as testified by at least one of the character witnesses, that the arrest on the narcotics charge was "general knowledge" in the community, and that the witness also knew of the prior arrest in New Jersey, but nevertheless insisted that these were mere accusations which did not affect his testimony that appellant's reputation was good.

The following instruction to the jury on this subject is without a flaw:

"The fact that a defendant has been arrested or indicted for other crimes is in itself no proof whatever of his guilt in this case, and it is not to be considered as such. It goes to how much weight you want to give to the testimony of the character witnesses."

There is nothing in the claim that Michelson, supra, requires that some such instructions be given at the time the evidence was received. Moreover, had counsel made a request that such an instruction be given when the subject of these arrests was first brought into the case, there is no reason to suppose that the trial judge would have refused to accede to the request.

■ (3) In order to consider the propriety of certain rulings made during the cross-examination of appellant and a further contention relative to a comment made by the prosecutor during his summation, it is essential to understand the nature of appellant's interrogation on direct examination by his own counsel. Without making too long a story of it, appellant testified at length on the subject of his service in the Marines in World War II, enumerating all the various medals he had received, describing himself as among "the unsung heroes," as engaged in "suicide work" and as having been "stabbed" in combat overseas; he testified that he lived with his wife and supported his family; and he went into the subject of his income and his financial resources at great length, describing himself as a working man of extremely modest means, with a keen interest in the labor movement and total earnings of only $411 in the year 1951, for which he had filed no income tax return.

It will be recalled that what led to the bribery in the beginning was a series of questions put to appellant at his first interview with McSweeney on the subject of certain trips to Europe made by appellant in 1951. When this subject came

up appellant abruptly terminated the interview and left the room. Consequently, it is fair to infer that his elaborate testimony about his wife and family and his modest means and small earnings was designed to give the jury the impression that such a man could have no income tax problem and that the so-called investigation was part of a shakedown by McSweeney or an entrapment by the government agents, which in some way unbeknown to appellant led uncle John Pagano and his friend Puppy to send Mauro down with the money. There are broad hints to this effect in the summation of appellant's counsel.

In any event, the prosecutor could hardly be expected to refrain from attempting on cross-examination and on summation to destroy this picture of appellant as a steady family man with the income of a bricklayer. The cross-examination of the trips to Europe in 1951 was devastating, especially that relating to the second trip without his wife; and the explanation of where the money came from probably left an indelible impression on the minds of the jurors.

It is in this setting that the trial judge permitted the prosecutor, over objection, to ask appellant on cross-examination whether or not he had registered and stayed at a hotel in Florida in 1954 with a woman other than his wife. This was not for the purpose of disclosing mere immorality; it served to demolish the claims appellant had voluntarily asserted on his direct examination.

Moreover, the trial judge in his instructions to the jury mentioned the fact that on cross-examination appellant "gave lengthy testimony going into particulars about various events in his life," and he cautioned the jury that this testimony had a bearing solely on the question of appellant's credibility as a witness.

■ (4) Building upon the foundation laid on appellant's direct examination his counsel in summation, not once but repeatedly, described appellant as in "hand to hand combat with the enemy," "stabbed, wounded in action," "he left his blood in a foreign country," and so on.

When the prosecutor's turn came he reviewed the evidence in a matter of fact fashion, quite free from oratory and declamation; and, in the course of his summation, he made the following statement:

"Ladies and gentlemen of the jury, you know from your own experience, and I know from mine, that when any soldier is in combat and is wounded in combat he receives the Order of the Purple Heart, and this defendant did not receive the Order of the Purple Heart, and this defendant was not wounded in combat.

"I take nothing away from this defendant for his loyal and faithful service to the Government in combat. May I say to you that he should be commended for that, as all who have served in the Armed Forces during war should be commended, and I am the first to commend him for it."

There was nothing inflammatory about this. The prosecutor was not claiming that he knew of his own knowledge that appellant had not been wounded in action. Appellant had testified to what he described as his medals and citations, and they did not include the Order of the Purple Heart. It was fair argument from this that he had not been wounded; and one of the principal questions in the case was that of appellant's credibility.

In any event, no objection was made during or at the close of the summation on behalf of the government, nor was any motion made for a mistrial. But the following day appellant's counsel requested the court to reopen the case for the purpose of receiving the testimony of alleged eye-witnesses "who were on the battlefield when he was wounded." This motion was properly denied.

As the trial was conducted throughout with a scrupulous regard for the pro-

tection of appellant's rights and as the record is wholly free from error, we are constrained with some reluctance to affirm the judgment.

Affirmed.