281 F.2d 581
 60-2 USTC P 9649
 UNITED STATES of America
v.
Samuel KRAVITZ, Appellant in Nos. 13180, 13182 and 13183,
and Herman Kravitz, Appellant in Nos. 13181, 13182
and 13183.
 Nos. 13180-13183.
United States Court of Appeals Third Circuit.
 Argued July 11, 1960.
Decided Aug. 12, 1960, Rehearings Denied in Nos. 13181,
13182 and 13183, Sept. 30, 1960.
 
 Jacob Kossman, Philadelphia, Pa., for appellants.
 Frederic C. Ritger, Jr., Asst. U.S. Atty., Newark, N.J. (Chester A. Weidenburner, U.S. Atty., Newark, N.J., on on the brief), for appellee.
 Before GOODRICH, KALODNER and FORMAN, Circuit Judges.
 GOODRICH, Circuit Judge.
 
 
 1
 This is an appeal from convictions of two defendants, father and son, for income tax evasion and conspiracy. There are four indictments and each defendant was found guilty on the three applicable to him.[1] Defendants appeal, not on the basis of the insufficiency of the evidence as to Herman Kravitz (the son) but for alleged errors in the conduct of the trial and in the jury charge. With regard to Samuel Kravitz (the father), the point is made that the evidence is insufficient to convict him. This latter point will be discussed separately.
 
 
 2
 Just enough facts will be stated to indicate the nature of the case before the trial court. The two Kravitzes were the owners of all the shares in a corporation called Kravin Park Clothes. 'Fifty-five percent of the stock was owned by Samuel and forty-five percent by Herman Kravitz. This company had contracts with the United States for the furnishing of uniforms at the time of the Korean War. It was charged and proved by the evidence that earnings were drained off from Kravin Prak to other corporations. Some of these corporations were controlled by the conspirators and used for the purpose; in other instances, bank accounts were set up in the names of existing corporations but in banks not used by those corporations and without the officers of those corporations knowing what was being done. In this way, obviously, the amount of profit on which Kravin Park was compelled to pay income tax was greatly reduced since, on its books and tax return, these payments were recorded as having gone out to the corporations named for subcontractor work supposed to have been done by them. So far as the evidence showed, the actual operations of this plan were carried on by Joseph Abrams[2] and Herman Kravitz. Abrams was a key witness for the prosecution and most of the summation by defense counsel consisted of an attempt to discredit his testimony. The money thus siphoned from the treasury of Kravin Park was in turn drawn out of the banks in which it was deposited. It is not necessary to go into detail concerning just how this was done nor in what the withdrawn funds were invested. Nor is it necessary to follow through the difference of opinion which developed between Abrams and Herman Kravitz as to who got what.[3]
 
 
 3
 On this appeal defendants' counsel presents a great many alleged errors as a basis for reversal. It seems to us that his greatest emphasis is directed to the charge of the trial judge and to the prosecuting attorney's summation. We shall deal with these first, then take up the alleged errors occurring in the course of the trial and finally deal separately with the case against Samuel Kravitz, the father.
 
 
 4
 The Charge.
 
 
 5
 Appellants' counsel makes a scattering shotgun attack at the charge of the trial judge saying that it is an argument for the prosecution rather than an objective description of the case to the jury and a presentation of issues for that body to decide. This general attack is not well founded. The trial judge gave a thorough and, quite evidently, carefully prepared charge to the jury. He told it what the offenses were with which the defendants were charged. He read Section 145(b) of the Internal Revenue Code of 1939 and Section 371 of 18 U.S.C.A. He explained at length the difficult-to-explain crime of conspiracy and he recounted the witnesses one by one for the jury's consideration. It is not to be expected that counsel for the defense would see the charge in the same light as that of a reviewing court. There is no doubt that, on the whole, the trial judge made a fair presentation to the jury.
 
 
 6
 Now we turn to particular points complained of by counsel with regard to the charge. The judge mentioned to the jury the testimony of Abrams. The judge said he did not believe all of Abrams' testimony but thought that on the whole it was acceptable. He pointed out one instance where it was shown that Abrams had lied in his testimony. He also commented upon the evidence produced from a transcript of Grand Jury hearings in New York where Herman Kravitz had testified upon the same subject matter. The judge said he did not believe all of Herman Kravitz's testimony either and he pointed out why.[4]
 
 
 7
 None of this goes beyond the power of a federal judge to comment upon testimony when he sees fit. There was nothing venmous about the judge's characterization of the testimony of these two men. That a federal judge in a criminal case may comment on the evidence to the jury and give his personal opinion thereon is too well established to require elaborate citation of authority.[5] The point is that he must not prejudice the case and he must leave ultimate determination of the facts to the jury.[6] In his charge the trial judge said at least five times that the determination of the facts was for the jury. He not only said it in passing but he emphasized it so no juror who was listening could have any doubt about what his responsibility was.[7] Defendants' point is not well taken.
 
 
 8
 Another complaint made by the appellants is that the juege misled the jury in quoting an excerpt from the Supreme Court opinion in Spies v. United States, 1943, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418.
 
 
 9
 This objection is so thin as to be almost frivolous. The trial judge was explaining to the jury the meaning of the term 'willful attempt to evade' as used in the statute. Then he quoted this excerpt from Spies.
 
 
 10
 'By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime.' 317 U.S. at page 499, 63 S.Ct. at page 368.
 
 
 11
 Nobody had claimed in this case that anybody had kept a double set of books. But the reading of the line of illustrations used by the Supreme Court to show the application of the terms in the statute was proper help to give the jury and the very language used in the Supreme Court opinion showed that the various points stated were 'by way of illustration.'
 
 
 12
 The defense also complains that the judge quoted testimony of a witness named Laura Barko but that he did not read Mrs. Barko's cross-examination. The testimony had to do with the establishment of an account in one of the banks which was a recipient of the siphoning process. The particular question involved signature cards. Cross-examination showed that the witness had made a statement several years earlier to a federal investigating officer in which she had not mentioned Herman Kravitz. But in the court room she did mention Herman Kravitz. The jury had all this before it. The witness did not recant her original testimony upon cross-examination. The whole episode was but a drop in the bucket which by the time the drop was put in was nearly overflowing.
 
 
 13
 The Summation.
 
 
 14
 The defense complains of the language used in the next to the last paragraph of the government's summation. The prosecutor said: 'This crime that we are dealing with here is, in a real sense, treason. These defendants, by their action, have torn away the very foundation of our Government. Unless the Government maintains a strong, even economic keel, it will be destroyed.' It should be noted that prior to this burst of oratory the government's summation had been strictly factual. The prosecutor had described the way in which the conspiracy was alleged to have operated and recalled to the jury various bits of evidence which, according to his argument, made the case against the defendants a convincing whole. Then for three sentences the departure from the record took place. We think little of the words used by the prosecutor. We think they were unnecessary in an otherwise logical and convincing summation. But we quite realize as we have said before that some latitude must be given to lawyers' language in a hard fought case.[8] To say that this remark would have a prejudicial effect on a jury which had listened throughout a long trial to the unfolding of the testimony is to attribute a stupidity and absence of common sense which is incredible in a federal jury.[9] Even counsel for the defendants, in arguing the point orally, said that everybody knows what treason is. We, too, think that everybody does, although perhaps not with full knowledge of the words used in the Constitution.
 
 
 15
 We do not, however, pass this point lightly. A United States attorney in a criminal case has an even greater responsibility than counsel for an individual client. For the purpose of the individual case he represents the great authority of the United States and he must exercise that responsibility with the circumspection and dignity the occasion calls for. His case must rest on evidence, not epithet. If his case is a sound one his evidence is enough; if it is not sound, he should not resort to epithet to give it a false appearance of strength. The language just quoted is deplorable.
 
 
 16
 Furthermore, on this point, the defendants' counsel did not say a word. Had he thought the language harmful to his clients at the time, he could have objected and we have no doubt that the court would have corrected any erroneous impression that the jury might have had and that the prosecutor would have apologized for his use of the term. Alternatively he could have moved for the withdrawal of a juror. We think the defendants' lawyer is not entitled to lie low, say nothing and to bring up this fleeting argument months afterward as a basis of reversal.[10]
 
 
 17
 The Alleged Trial Errors.
 
 
 18
 We turn now to complaints about the conduct of the trial.
 
 
 19
 One objection has to do with alleged improper limitation of defense counsel in his reading of certain testimony of Herman Kravitz given before the Federal Grand Jury in New York City. The transcript of Herman Kravitz's testimony before the Grand Jury was released for use in this case by the judge in New York[11] and portions were read into evidence by the prosecutor. He selected, of course, those parts of the Kravitz testimony which admitted participation in the unlawful scheme. The testimony was highly damaging. The defense was permitted to read into evidence other portions of Herman Kravitz's testimony before this same Grand Jury. The question of what defense counsel would be permitted to read was discussed at length between counsel for the prosecution, counsel for the defense and the judge out of the presence of the jury. When the judge said he was not going to admit one of the things which defense counsel wanted to read the judge indicated that he would be glad to hear defense counsel on a motion to introduce the whole record. Counsel did not follow this offer up.
 
 
 20
 The portions read into evidence by the defense had to do with explanations of statements in the excerpts read into evidence by the prosecution.[12] Limiting defense counsel to such items was proper and any argument to the effect that if part of the record is introduced all should be received is not well founded in view of the defense's failure to ask for the whole business.[13] As to proper limitations upon the opponent's right to introduce the remainder of a verbal utterance, see 7 Wigmore, Evidence 2113 (3d ed. 1940).
 
 
 21
 Complaint is made of permission given to Abrams to plead the Fifth Amendment privilege against self-incrimination. Abrams, under cross-examination, was asked whether he was guilty of the charges pending against him in the District Court for the District of New Jersey. Abrams was not represented by counsel. The judge told the witness that he need not answer and he claimed his constitutional privilege. We see no error in this. Abrams had already admitted a very great many damaging acts in connection with the charge of conspiracy and it clearly appeared that he was already in jail. To ask him outright and make him say whether he was guilty of pending charges was certainly placing him in the dilemma of getting into trouble for perjury or admitting his guilt in the matters charged. There was no error; if there was, it could not possibly have been prejudical. Indeed, the trial court told the jury it could consider Abrams' pleading of the constitutional privilege as bearing upon his credibility. If this went too far the prosecution did not complain about it.
 
 
 22
 Error is alleged in the admitting into evidence of a memorandum which Abrams said that he and Herman Kravitz had worked out together back in 1952.[14] This document put down a great many figures concerning their transactions; Abrams said it was shown to no one but was just a matter 'between he and I.' The admission of this document is attacked because as 'past recollection recorded,' the proper foundation was not laid. Abrams did not say he did not remember at the time of testifying all the material in the document. He did not say he did remember it all either. But he claimed to remember a very great deal, and was even able to state from present memory that the memorandum differed from the final accounting between Herman Kravitz and himself by no more than $10,000 to $20,000.
 
 
 23
 We do not need at this time to reexamine the basis of what is charged to be an artificial and too strict limitation upon the introduction of documents under the past recollection recorded rule.[15] The point to dispose of the objection here is that if Abrams' testimony was believed this was a joint document with Herman Kravitz. If so, it is admissible, of course, as an admission against Herman Kravitz even though cumulative.[16]
 
 
 24
 Finally, appellants complain that it was error for the court to refuse to continue the case and to examine the minutes of a proceeding before the Federal Grand Jury in Brooklyn, New York. The trial court emphasized to defense counsel that, while counsel was on notice two weeks before that the prosecution was going to use the New York Grand Jury testimony, he did nothing about getting the Brooklyn Grand Jury minutes until too late to get the Brooklyn court to consent to the removal during the time testimony was being given at the Camden trial.
 
 
 25
 We find no error in the trial court's refusal to continue this case while these minutes were examined. There is no showing of who the witnesses were whose testimony was supposed to be looked at or what connection they had with the trial going on in Camden. At the time counsel for the defense asked the court to examine these minutes the testimony was all in and the trial had been a long and technical one. In the absence of any showing of what the tardily procured minutes would help to prove, it certainly was not error to finish up the already prolonged litigation in Camden.The Sentence.
 
 
 26
 Counsel urges the point that, while an appellate court may not correct sentences in the federal system, when the sentence is unduly harsh it should make the court extraordinarily astute to make sure that the trial was fair.[17] We have two answers to this point in regard to this case. First. We have examined the record and the objections with great care. Second, the sentence, while severe, is not shockingly brutal. Herman Kravitz is sentenced, counting the concurrent terms, to ten years in prison and to pay a fine of $30,000. This is within the sentence allowed by the statute.[18] The case, if the testimony for the prosecution is believed, and the jury accepted it, shows a shocking well-planned scheme to cheat the government. It is not surprising that the sentence showed that the judge regarded the matter as a very serious one.
 
 
 27
 The Case Against Samuel Kravitz.
 
 
 28
 Samuel Kravitz is the father of Herman Kravitz. The whole story of the Kravitz-Abrams dealings which was in evidence was limited to Herman. Let us turn to what there is to connect Samuel Kravitz with this scheme.
 
 
 29
 Samuel Kravitz was the president and majority shareholder in the corporation Kravin Park Clothes. He, along with the accountant who prepared the tax return, signed the corporation's income tax return for the year 1951, the year in question. We do not know of any connection with the financial end of the corporation by Samuel Kravitz. There was testimony that he knew Abrams and gave Abrams expert advice about preparing bids for government contracts; but that is all. One of the corporations to which money from Kravin Park Clothes was diverted was called J. K. Productions. Samuel Kravitz signed a corporate resolution setting up a bank account for J. K. Productions.[19]
 
 
 30
 There is one episode which does cast suspicion. An account was opened with a Mr. Wood, an officer in the Leonia Bank and Trust Company of Leonia, New Jersey. This account was in the name of 'E. W. Randal' and could have been found to contain proceeds of the siphoning process already described. Wood could not remember whether Samuel Kravitz or Herman Kravitz opened this account. He remembers that in 1954 both of these men visited him one evening at his home and upon leaving one of them left upon a chair a package containing some coupons, clipped from bonds, to be deposited in the Randal account. Samuel Kravitz, in 1953, cashed two checks with a factor named Brown which were signed, made payable to and endorsed 'E. W. Randal.'
 
 
 31
 We think the most that can be said in the case against Samuel Kravitz is that there are one or two circumstances which arouse a little suspicion and might make one lift one's eyebrows. But we do not find, after a careful review of the case as a whole, that there is enough here to justify twelve reasonable jurors to find him guilty beyond a reasonable doubt. The case, as said before, was a complicated one and it could well be that with the best of intentions jurors were so impressed with the weighty case made out against Herman Kravitz that the father, Samuel, was unconsciously dragged in.
 
 
 32
 As to Herman Kravitz, the judgments of the district court are affirmed. As to Samuel Kravitz, the judgments are reversed and the case remanded to the District Court for the District of New Jersey with directions to file judgments of acquittal.
 
 
 
 [1]
 Indictment No. 114-58 charged Samuel Kravitz with willfully attempting to evade personal income taxes owed by him for the year 1951 by willfully understating his net income on the return filed by him for that year in violation of 145(b) of the Internal Revenue Code of 1939, 26 U.S.C.A. 145(b)
 Indictment No. 115-58 charged Herman Kravitz with a similar offense with regard to his personal income taxes for that same year.
 Indictment No. 116-58 charged Samuel Kravitz, Herman Kravitz and Joseph Abrams with unlawfully conspiring to evade income and excess profits taxes owed by Kravin Park Clothes, a corporation, for the year 1951 in violation of 18 U.S.C.A. 371, and specified certain overt acts performed by the conspirators in furtherance of the alleged conspiracy.
 Indictment No. 117-58 charged Samuel Kravitz, Herman Kravitz and Joseph Abrams with attempting to evade taxes owed by Kravin Park Clothes for the year 1951 by willfully understating the corporation's net income on the tax return filed by it for that year in violation of 145(b) of the Internal Revenue Code of 1939.
 An order of severance was entered as to Joseph Abrams on the two indictments in which he was included.
 
 
 [2]
 Joseph Abrams was a former public accountant who had handled the Kravin Park account from 1944 until 1949 when he gave up his accounting practice. He considered himself to be a tax expert
 In 1951, the year in question, Abrams was in the clothes manufacturing business. At the time of trial, he was serving a prison sentence for filing false tax returns for himself and a corporation known as Fabric Garment Company for the year 1952 and for stealing certain goods from that company.
 
 
 [3]
 In Volume IX of the English publication called 'Law Quarterly Review' (July, 1893) there is a note at page 197 about the litigation called 'The High-wayman's Case.' It was a bill in equity
 'It recites an oral partnership between the defendant and the plaintiff, who was 'skilled in dealing in several sorts of commodities;' and that the parties had 'proceeded jointly in the said dealings with good success on Hounslow Heath, where they dealt with a gentleman for a gold watch;' and that defendant had informed plaintiff that Finchley 'was a good and convenient place to deal in, and that the said commodities were very plenty at Finchley aforesaid,' and that if they were to deal there 'it would be almost all gain to them.' Further recitals show how the parties accordingly 'dealt with several gentlemen for divers watches, rings, swords, canes, hats, cloaks, horses, bridles, saddles, and other things to the value of 200 and upwards;' and how there was a gentleman at Blackheath who had several things of this sort to dispose of, which defendant represented 'might be had for little or no money, in case they could prevail on the said gentleman to part with the said things;' and how, 'after some small discourse with the said gentleman,' the said things were dealt for 'at a very cheap rate.' The Bill further recites that the parties' joint dealings were carried on at Bagshot, Salisbury, Hampstead, and elsewhere, to the amount of 2000 and upwards; and that the defendant would not come to a fair account with the plaintiff touching and concerning the said partnership. The Bill, which concludes with a prayer for discovery, an account, and general relief, purports to be signed at the foot by counsel, one Jonathan Collins.' 9 L.Q.Rev. at 197-198.
 The article reports that it is further stated that John Everet, the plaintiff, was executed at Tyburn in 1730; Joseph Williams, the defendant, at Maidstone in 1727. Id. at 199.
 
 
 [4]
 The relevant portions of the charge are as follows:
 While, the weight and credit to be given to the testimony of a witness is a province of the jury, it is also proper for the court to make such observations regarding the witnesses and their credibility as the court may feel the circumstances of each particular case may require. Such observations by the court are not to impinge upon the rights of the jury or to usurp its functions in weighing the evidence but are limited solely to the duty of assisting the jury in its deliberations. I specifically reiterate that if your recollection is different than mine it is your recollection that controls, and if your observation of the witness leads you to a different conclusion than mine, you are the final judges of the weight and credibility of the evidence.
 'There has been considerable comment regarding the credibility of the witness Joseph Abrams. Let me say quite frankly to you that I do not believe Joseph Abrams absolutely and in all respects. In the Court's estimation it would be difficult for any man to get on the witness stand and be absolutely correct regarding what happened back in 1951, especially when it involves the multifarious transactions surrounding these events, hundreds of thousands of dollars, fictitious invoices, fictitious bank accounts, millions of dollars of bonds. It is easy to see how a mistake would be made. When you couple that with the admission on the part of Abrams that he still has criminal and civil tax problems to face in the future, one has some difficulty in accepting his entire story as gospel in all respects.
 'However, in view of all the other testimony and evidence I say quite frankly to you, members of this jury, that in the main I believe the testimony of Abrams as credible. The only recollection that the Court has of Abrams's testimony being at variance with the truth, as I see the truth in the matter, is that in his testimony, that he did not sign the name Joe Haber on the signature card, Exhibit G-54, the account in the name of Model Clothes in the Royal Industrial Bank, when it appears from the stipulation of the handwriting expert that he did.
 'Is this sufficient to disregard his testimony altogether regarding this scheme and the various parts the defendants played in it? That is for your judgment.
 'And, just as I have informed you of my reactions regarding the credibility of the testimony of Abrams, I think it proper also to point out to you my beliefs regarding the testimony entered in the record here of Herman Kravitz before the Grand Jury in New York. I do not believe that testimony in all respects and for the same reasons. Kravitz knew then that he had criminal and civil tax problems to face in the future the same as Abrams had and has.
 'Let me point out to you the exhibit which is a jeopardy assessment notice against Kravin Park Clothes in the amount of $1,252.077, dated November 1, 1956. Let me further remind you that Herman Kravitz was indicted, as you can see from the indictments which you will take into the jury room with you, on March 13, 1958, and that he plead not guilty to those indictments in this court, according to the records of the court, on June 20, 1958. This was prior to the testimony of Kravitz in New York on June 24 and June 30, 1958. So that it is completely possible that Herman Kravitz had an eye to the future at that time and was putting his best foot forward.
 'I again remind you that it is not the Court's intention or function to usurp your duties or rights in determining what weight and credit shall be given to the witnesses and again I admonish you that if your belief in this regard is different than mine, then it is your belief that controls.'
 
 
 [5]
 See e.g., Quercia v. United States, 1933, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321; United States v. Murdock, 1933, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381; United States v. Curzio, 3 Cir., 1948, 170 F.2d 354, 357; United States v. Rutkin, 3 Cir., 1951, 189 F.2d 431, 440, affirmed on other grounds, 1952, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833
 
 
 [6]
 See cases cited note 5 Supra. See also United States v. Gollin, 3 Cir., 166 F.2d 123, 127, certiorari denied 1948, 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151; Sullivan v. United States, 1949, 85 U.S.App.D.C. 409, 178 F.2d 723; Billeci v. United States, 1950, 87 U.S.App.D.C. 274, 184 F.2d 394, 402-403, 24 A.L.R.2d 881; United States v. Link, 3 Cir., 1953, 202 F.2d 592, 594-595; Blunt v. United States, 1957, 100 U.S.App.D.C. 266, 244 F.2d 355, 365-366; Buchanan v. United States, 6 Cir., 1957, 244 F.2d 916, 919-920; Benes v. United States, 6 Cir., 1960, 276 F.2d 99, 102-104
 
 
 [7]
 He made such a statement both immediately before and immediately after his reference to the testimony given by Abrams and the Grand Jury testimony of Herman Kravitz. See note 4 supra
 
 
 [8]
 See United States v. Stirone, 3 Cir., 1958, 262 F.2d 571, 577, reversed on other grounds 1960, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252. See also United States v. Sober et al., 3 Cir., 281 F.2d 244; Di Carlo v. United States, 2 Cir., 1925, 6 F.2d 364, 368
 
 
 [9]
 See United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 237-240, 60 S.Ct. 811, 84 L.Ed. 1129
 
 
 [10]
 Ibid. See also Jenkins v. United States, 5 Cir., 1958, 251 F.2d 51, 52
 This case is not al all like those exceptional cases where justice would require us to reverse even though defense counsel voiced no objection to the prosecutor's remarks at the time. Compare Viereck v. United States, 1943, 318 U.S. 236, 248, 63 S.Ct. 561, 87 L.Ed. 734; Stewart v. United States, 1957, 101U.S.App.D.C. 51, 247 F.2d 42; Ginsberg v. United States, 5 Cir., 1958, 257 F.2d 950, 954-955, 70 A.L.R.2d 548; Wagner v. United States, 5 Cir., 1959, 263 F.2d 877, 882-884.
 
 
 [11]
 See Fed.R.Crim.P. 6(e), 18 U.S.C.A
 
 
 [12]
 The defense was in this way able to introduce into evidence testimony which tended to show that Abrams had kept all of the diverted funds
 
 
 [13]
 Defense counsel's failure to request that the complete transcript be introduced into evidence was probably based on the fact that certain portions not read into evidence by either side would have been, as the trial judge so aptly put it, 'terribly detrimental to the interests of the defendant.'
 
 
 [14]
 Although the handwriting was entirely that of Abrams, Abrams' testimony is explicit in pointing out that Herman Kravitz participated in the preparation of the document
 
 
 [15]
 Compare 3 Wigmore, Evidence 738 (3d ed. 1940) and McCormick, Evidence 277 (1954) with In re Messenger, D.C.E.D.Pa.1940, 32 F.Supp. 490, 495-497. See generally on 'past recollection recorded' and 'present recollection revived' United States v. Riccardi, 3 Cir., 174 F.2d 883, certiorari denied 1949, 337 U.S. 941, 69 S.Ct. 1519, 93 L.Ed. 1746
 
 
 [16]
 4 Wigmore, Evidence 1048 et seq. (3d ed. 1940)
 
 
 [17]
 Counsel relies on Amendola v. United States, 2 Cir., 1927, 17 F.2d 529, 530; United States v. Mazzochi, 2 Cir., 1935, 75 F.2d 497; and United States v. Pagano, 2 Cir., 1955, 224 F.2d 682, for this proposition
 
 
 [18]
 The maximum sentence he could have been given upon conviction on the three indictments was fifteen years in prison and a $30,000 fine. See 18 U.S.C.A. 371 ($10,000 fine and/or five years in prison) and Int.Rev.Code of 1939, 145(b) (same). There were two separate violations of the latter statute. See note 1 supra
 
 
 [19]
 This was perfectly legitimate since, at the time, J.K. Productions was partially owned and controlled by the Kravitzes