UNITED STATES of America,
Appellee,

v.

Michael LIGHT, Michael F. Dermer, Arthur Kapplow, Hugh Strump and Charters & Co. of Miami, Inc., Appellants.

No. 318, Docket 31232.

United States Court of Appeals
Second Circuit.

Argued March 18, 1968.

Decided May 16, 1968.

Stephen L. Hammerman, Stephen F. Williams, James D. Zirin, Pierre N. Leval, Asst. U. S. Attys., Robert M. Morgenthau, U. S. Atty., for appellee.

Richard Harbus, New York City, for appellants.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge, and CLARIE, District Judge.*

* Of the District Court of Connecticut, sitting by designation.

CLARIE, District Judge:

The appellants were convicted, by a jury, of having conspired, in violation of 18 U.S.C. § 371, to violate specified sections of the Securities Act of 1933, 15 U.S.C. §§ 77q(a) and 77x and the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. Sentences were imposed ranging from a fine of $10,000 to three years imprisonment and a committed fine of $2,500.[1] The indictment contained forty-one counts, but the appellants were named only in the first count. The remaining counts charged six other defendants and co-conspirators with fraud[2] in the sale of stock to the public. The judgment of the trial court is affirmed.

Appellants Kapplow, Dermer and Strump were officers of Charters and Co., Inc. (Charters), a Miami, Florida securities brokerage. Appellant Light was not an officer or stockholder in Charters but was one of its biggest customers. The government's evidence introduced at trial disclosed the existence of an involved scheme, whereby the price of stock in two nearly defunct corporations, Bankers Intercontinental Investment Co., Ltd. (Bankers) and Florida Patsand (Patsand) was artificially inflated and the stock sold to the public; proceeds from the profits were kicked back to the dealers, Charters and Broadwall Securities, Inc. (Broadwall), a New York broker-dealer. The appellants had originally arranged with Robert Evans, the principal stockholder of Bankers, to have the quoted bids for that stock placed on the National Daily Stock Quotation Service's "pink sheets" and gradually manipulated upward. The stock was then to be marketed to the public through Broadwall in return for a cash kick-back, from Bankers to Charters, which was initially set at 33⅓%, and

later increased to 40%, of the sales price. In return for its services, Broadwall was to receive a 30% cash kickback from Charters. To implement this plan a financial report of Bankers had been prepared which falsely described the company as engaging in a number of profitable businesses and having substantial earnings. This report carried the name of a reputable Nassau accounting firm so as to impart to it an aura of authenticity. In December of 1964, however, the Securities Exchange Commission began an investigation into the widespread activity in Bankers stock and appellants decided to stop promoting its sale and change to another stock. This new stock was Patsand. Appellant Light had managed to acquire a large amount of Patsand stock and, after arrangements were made with Broadwall, this stock was begun to be sold to the public under a similar pattern of kickbacks and price raising.

Appellants all testified in their own defense. They denied any participation in the kick-back scheme, either in making or receiving payments, or agreeing to do so. They admitted the occurrence of many of the meetings and transactions testified to by government witnesses, but contradicted the government version of what went on at these meetings and what the transactions represented.

## I. The Charge

Appellants' first claim of error involves the alleged failure of the trial judge to marshal fairly the evidence in his charge. They contend that the Court's review of the evidence against each defendant in turn, rather than in the order in which it was presented, was indicative of a partisan and biased attitude in favor of the prosecution. In charging the jury in this case, the

---

1. Light received a sentence of three years imprisonment and a committed fine of $2,500; Dermer received two years imprisonment; Kapplow and Strump received 18 months imprisonment; and Charters was fined $10,000.

2. The other defendants named were Broadwall Securities, Inc.; its president, Arnold Mahler; three of its salesmen, Norman Babat, Fred Cimino and Alexander Lapidus; and Robert Evans, the largest stockholder in Bankers Intercontinental Investment Company.

trial judge was faced with the monumental task of summarizing the large volume of evidence adduced during a long and complex trial, in which well over one hundred exhibits were introduced and two thousand pages of testimony taken. He had the all too familiar problem in multi-defendant conspiracy cases of selecting that evidence which would most likely aid the jury in putting the case in perspective while at the same time eliminating much of the evidence, the inclusion of which would render his charge unwieldy and confusing. It is axiomatic that a trial judge in a criminal case must use the utmost care not to give the jury the impression that he is partisan to either side. United States v. DeSisto, 289 F.2d 833 (2d Cir.1961). However, it is also true that in a long trial in which the prosecution has introduced far more evidence than the defense, the judge is not required to devote equal time in his summary to both the defense and the prosecution. United States v. Edwards, 366 F.2d 853, 868 (2d Cir. 1966), cert. denied, 386 U.S. 966, 87 S. Ct. 1048, 18 L.Ed.2d 117 (1967); United States v. Dardi, 330 F.2d 316, 330 (2d Cir.1964), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964); United States v. Kahaner, 317 F.2d 459, 476 (2d Cir.1963), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963). The trial judge exercises broad discretion in determining what evidence he will comment upon and as long as he does not invade the province of the jury, or adopt the role of an advocate, no error will be found in his failure to mention all of the evidence favorable to the defense. See, United States v. Bentvena, 319 F.2d 916, 940 n. 14 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). The trial judge included throughout his charge the usual admonitions that the jurors were the exclusive finders of fact, that they should consider all of the evidence, and that he should not influence them. Moreover, after having completed his charge and received the appellants' exceptions and additional requests, in an abundance of caution, he gave this supplementary instruction:

"Ladies and gentlemen, I have not reviewed all of the evidence in this case. If I had tried to do that, I would have been here a much longer time than I have. I want to emphasize that all of the evidence in the case is before you; * * *.

"You must not feel that I have in any way attempted to select out evidence and cover up other evidence. That has not been my purpose. I have tried to be helpful to you, but always with that utmost and sincere respect for your exclusive fact finding function * * *."

■ We find no abuse of discretion in the Court's marshaling of the evidence. Nor was it improper for him to review the evidence pertaining to each defendant in turn, having in mind the duty of the trial judge in multi-defendant cases to make the jury constantly aware that separate individuals are on trial and each must be judged solely on the evidence against him. United States v. Agueci, 310 F.2d 817, 840, 99 A.L.R. 2d 478 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963).

■ Appellants also complain that the trial judge erroneously charged that they had denied any kickbacks were made in connection with the sales of Bankers and Patsand stock, while they only had denied that they made any agreement to receive or had received kickbacks themselves. They claim that in view of the substantial evidence in the case that Broadwall and its salesmen had received kickbacks, the charge prejudiced defendants by leaving the jury with no choice but to assume defendants were lying. Having reviewed the charge in its entirety, we find no such prejudice. Whatever incorrect impressions might have been imparted to the jury by the two short sentences which appellants

cite to support their argument [3] were dispelled by the trial judge's statements, as he reviewed the testimony of each defendant, that such defendant was denying his own participation.[4] The jury were alerted to the possibility that they could acquit any one or more of the appellants because of lack of personal participation and still find that a fraudulent scheme, including kickbacks, had existed.

■ The third claim of error with respect to the charge stems from the misstatement by the judge of the factual pattern concerning Bankers stock. The jury was charged that on October 23, 1964, appellant Light sold 1900 shares of Bankers to Charters, whereas this transfer actually took place on two separate days; 1,000 shares on October 23, and 900 shares twelve days later on November 4. Appellants urge that had the Court correctly stated that two separate transactions were involved, the jury could have more readily found that the sales were made in the ordinary course of business rather than as part of the conspiracy. We fail to see how this trivial factual mistake could have seriously affected the defense here, especially in view of the Court's clear instruction that it was the recollection of the jury in this respect which was controlling.

## II. *The Refusal of the Trial Court to Strike the Rebuttal Testimony*

The government called Doctor Felix Fudge, a customer of Charters, as a rebuttal witness. He testified as to two of Charters' checks, payable to Michael Light, each in the amount of $3,000, which were endorsed to Fudge's order, and deposited in the latter's account at Charters. Light had testified that the checks represented loans from himself to Fudge. The latter, however, not only disclaimed any knowledge of the checks, but denied ever having borrowed from Light. Three other checks were also offered, which were payable to Fudge and endorsed with his purported signature, and deposited in Charters' account. Fudge testified that these signatures were not his and that he had authorized no one at Charters to sign his name. Appellants moved to have this testimony stricken as it imputed to them the commission of larceny and forgery, both felonies, and collateral to the crime charged in the indictment.

■■ It is the rule in the federal courts that "evidence of another crime may be introduced if, though only if, it 'is substantially relevant for some other purpose than to show a probability' that the defendant 'committed the crime on trial because he is a man of criminal character.'" (Citations omitted.) United States v. Bozza, 365 F.2d 206, 213 (2d Cir.1966); see also, United States v. Deaton, 381 F.2d 114, 117 (2d Cir.

---

3. "You have to ask yourself whether you accept the testimony and contentions of the defendants who deny absolutely any kick-backs in the case, * * *." Tr. 2197.

"Throughout their testimony, all of the defendants have denied any payment of kick-backs. They have denied any agreement to pay kick-backs. They completely put kick-backs out of the case." Tr. 2196.

4. "Light has summed up his own case, and he has also testified in his behalf * * *. He denies the payment of any kick-backs, his participation in the payment of any kick-backs. He has denied any agreement to pay kick-backs, and he says that his transactions were legitimate transactions of a trader who dealt with Charters." Tr. 2220.

"Here again a very direct and express controversy of fact in almost every particular, Dermer denying any guilty participation, any knowledge of kick-backs, any agreement to work with Charters on a kick-back basis, * * *." Tr. 2221.

"But Kapplow took the stand, denied any participation of any kind, any kick-back arrangement or any kick-back implementation, * * *." Tr. 2229.

"Now, with respect to Strump's participation in the conspiracy, * * * a specific and express denial that he ever participated in any kick-back arrangement of any kind." Tr. 2232.

1967) and cases cited therein; 1 Wigmore, Evidence (3d ed.1940) § 216. The prosecution offered Fudge's testimony for the purpose of showing that appellants had used his account to conceal the influx of moneys to Charters from illicit payments and also the payments of kickbacks to Broadwall. This testimony, notwithstanding its being evidence of other criminal conduct, was relevant to show the plan or device for carrying out the crime charged in the indictment and thus, under the rule stated above, was clearly admissible.

■ Appellants cannot claim prejudicial surprise because Fudge was not listed on the government's pre-trial witness sheet. He was called as a rebuttal witness to counter the claims of the appellants that they had borrowed from and made loans to Fudge. This area had been opened up by appellants themselves and they cannot now complain that the prosecution has introduced evidence to rebut their proof.

### III. The Government Suppressed Evidence Favorable to Appellants

■ Appellants allege that the prosecution refused to make available to the defense one James Binford, a former cashier at Charters, whose testimony would have refuted that of Fudge. This contention deserves but brief comment. The record indicates that Binford was an employee of Charters and at the time of the trial was working for Light and Dermer in another enterprise. It appears that while in New York for the trial, he roomed with the appellants at their hotel.[5] Thus it is not credible to believe that the government was guilty of suppressing his whereabouts. After Fudge's testimony, appellants' counsel represented that he desired to confer with Binford and possibly call him as a

witness. When the trial resumed the following day, no further continuance was sought. Appellants cannot now argue for a new trial based on the existence of what is now claimed might have been favorable evidence, without first clearly establishing to the trial court that this evidence was unavailable to them at the time of trial. United States v. Abrams, 357 F.2d 539, 550 (2d Cir. 1966); United States v. Costello, 255 F. 2d 876, 879 (2d Cir.1958), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958).

### IV. The Denial of the Motion to Suppress

Appellants contend that the trial court erred in denying their motion to suppress certain books and records of Charters which were obtained by the Securities Exchange Commission during a civil injunction proceeding and which were later turned over to the United States Attorney's Office. It is undisputed that appellants consented to the removal and examination of the books by the Securities Exchange Commission, and this consent was given with the advice of counsel. Nor is it denied that the documents seized were "public records" which were required to be kept and made available to the Securities Exchange Commission. 15 U.S.C. § 78g(a); 17 C.F.R. § 240.17a–3–4; SEC v. Olsen, 354 F.2d 166, 170 (2d Cir. 1965). The thrust of the argument is that by turning the records over to the United States Attorney, the Securities Exchange Commission exceeded the consent given and the subsequent use of the records, in the absence of a warrant, was illegal.

■ A similar argument was rejected by this Court in United States v. Sclafani, 265 F.2d 408 (2d Cir.1959),

---

5. Mr. Hammer: " * * * So first may I respectfully inquire of the Government, is Mr. Binford still in New York or in the building so that I can talk to him here in New York?"

Mr. Hammerman: "Mr. Binford is not in New York, and nobody would know

that better than the defendants since he was rooming with the defendants during his prior stay here."

Mr. Hammer: "Yes, but nobody knew that this evidence was going to be introduced which would require it." Tr. 1976.

cert. denied, 360 U.S. 918, 79 S.Ct. 1436, 3 L.Ed.2d 1534 (1959). There a routine audit of a taxpayer's records was commenced by the Internal Revenue Service and books and documents were voluntarily turned over to the Revenue Agent. As a result of the discovery of certain discrepancies, the investigation was referred to a Special Agent of the Intelligence Division who obtained further evidence from the taxpayer without informing him of the increased likelihood of criminal prosecution. The defendant's motion to suppress these records was denied and this Court affirmed on the theory that the ordinary taxpayer is aware that a routine tax audit carries with it the inherent possibility that if criminal liability is discovered, it will be turned over to the proper authorities for prosecution. Similarly, in the case of a Securities Exchange Commission investigation the broker-dealer must be aware that the discovery of evidence of criminality could lead to prosecution. Indeed, the Securities Exchange Act expressly provides that such evidence may be turned over to the Attorney General.[6] We see no distinction between the situation presented in *Sclafani* and that existing here. In either case, once records have been voluntarily turned over to a government agent, the government is not guilty of fraud or deceit in failing to apprise the subject of a change in the character of the investigation, for he is made aware of the risks attendant upon a voluntary disclosure by the warning inherent in the request.

■■■ Appellants are not aided by their contention that the Securities Exchange Commission allegedly violated its agreement to return the books and records on request and not make them available to anyone else. The investigators obtained the records for inspection by lawful means and even assuming, *arguendo*, that their delivery to the United States Attorney was a violation of this agreement, the Fourth Amendment would not bar their admission into evidence in the absence of a showing that they were obtained through fraud and deceit in the first instance. Zap v. United States, 328 U.S. 624, 629–630, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946).

## V.  *The Admission of the Guilty Pleas of the Co-Defendants*

■■■ Appellants claim serious prejudice from the cumulative effect of the testimony of four co-defendants who stated on direct examination that they had pled guilty to various counts of the indictment and the testimony of a co-conspirator that he had pleaded guilty to conspiracy to give false testimony before the SEC. We see no reason to overturn our long standing rule that a party may elicit from a co-defendant or co-conspirator, on direct examination, that he had pled guilty to the crime charged in the indictment so long as the jury is cautioned that the testimony is no evidence of the guilt of the defendant on trial. United States v. Graziane, 376 F.2d 258, 259 (2d Cir.1967); United States v. Mahler, 363 F.2d 673, 678 (2d Cir. 1966); United States v. Aronson, 319 F.2d 48, 51 (2d Cir.1963), cert. denied, 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164 (1963); United States v. Freeman, 302 F.2d 347 (2d Cir.1962), cert. denied, 375 U.S. 958, 84 S.Ct. 448, 11 L.Ed.2d 316 (1962); United States v. Pagano, 224 F.2d 682, 684 (2d Cir.1955), cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.

---

**6.** Section 21 of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(e) provides in part:

"Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter * * * it may in its discretion bring an action * * * to enjoin such acts or practices * * *. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter."

See also, Section 20 of the Securities Act of 1933, 15 U.S.C. § 77t(b).

Ed. 779 (1955). The jury here was properly instructed that they should draw no inference of appellants' guilt from the pleas of the co-conspirators. Judgment affirmed.