Steven B. BOZIN, Plaintiff,

v.

SECRETARY OF the NAVY,
Defendant.

Civ. A. No. 86–1636.

United States District Court,
District of Columbia.

April 2, 1987.

Eugene R. Fidell, Washington, D.C., for plaintiff.

Richard E. Greenberg, Asst. U.S. Atty., Washington, D.C. and Brian G. Kennedy, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM

GASCH, District Judge.

## I. INTRODUCTION

This case arises on review of a Marine Corps Special Court-Martial in which plaintiff Steven Bozin was convicted for using marijuana "on or near" the Marine Corps Air Station in Beaufort, South Carolina. Plaintiff urges that the court-martial conviction should be invalidated as violative of due process on five separate grounds. The five issues raised by plaintiff are: (1) whether due process was unconstitutionally abrogated since the trial and appellate military judges lacked the protection of a term of office; (2) whether the government failed to prove its case against plaintiff beyond a reasonable doubt; (3) whether the court-martial lacked jurisdiction because the offense was not "service-connected"; (4) whether plaintiff was denied a fair trial because the prosecutor's argument was inflammatory and prejudicial; and, (5) whether use of drug test results to obtain a criminal conviction of plaintiff violated his equal protection rights where evidence of drug testing may not be used in a criminal proceeding against civilian employees of the Federal Government pursuant to Executive Order 12564, 51 Fed.Reg. 32889 (Sept. 15, 1986).

## II. BACKGROUND

Plaintiff, prior to his court-martial conviction, was a staff sergeant with eleven years of service in the United States Marine Corps. Amended Complaint at ¶ 4. At the time of the offense alleged in his

conviction, plaintiff was assigned to "Animal Control" at the Marine Corps Air Station in Beaufort, South Carolina. *See* Court-Martial Transcript ("Tr.") at 307. His duties at this job were primarily dog catching and the entrapment of rabid animals. *Id.*

On September 17, 1984, plaintiff and other on-duty personnel provided urine samples for drug testing. Tr. at 52–53. This was a "surprise test" conducted by the Military Police. *Id.* Bozin's urine sample tested positive for the presence of tetrahydrocannabinol ("THC") or marijuana metabolites under the radioimmunology assay method of testing. The test result was confirmed by means of the Gas Liquid Chromatography/Mass Spectrometry ("GC/MS") test. Tr. at 85–90. The GC/MS test revealed that Bozin's sample had a THC level of 65 nanograms per milliliter. Tr. at 89. Under the Department of Defense ("DOD") standards, a urine sample tests positive for the presence of THC if there is a level of 20 nanograms per milliliter under the GC/MS test. Tr. at 90.

On December 5, 1984, plaintiff was charged with violating the Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. § 912a (1985). Specifically, the charge read that plaintiff "... did on or near Marine Air Corps Station, Beaufort, South Carolina, during the period from on or about 19 August 1984 to on or about 18 September 1984, wrongfully use marijuana, a schedule I controlled substance." Tr. at 7. From January 14 to January 16, 1985, a Special Court-Martial tried plaintiff for the above charge. The presiding military judge [1] invited both parties to conduct voir dire upon him, however, both parties declined the opportunity. Tr. at 5. At the commencement of trial, plaintiff elected to have his case heard by a military jury, one third of which would consist of enlisted personnel. Tr. at 5–6.

The trial record below is of considerable length. Discussion of the evidence produced is warranted, however, given plaintiff's contention that his conviction was inadequately proven. The government produced considerable evidence of the manner in which the urine sample at issue was taken, the controls over chain of custody of that sample, and samples in general, and expert evidence regarding testing techniques and results. Tr. at 52–103. There is no claim by plaintiff that the urine sample was not his, or that the testing procedures were faulty or the result of tampering. There is some evidence that on the day plaintiff's urine was tested, plaintiff expressed to the officers in charge his skepticism of urinalysis testing in the Marine Corps.[2]

At trial, Bozin testified that he had never smoked marijuana in his life. Tr. at 147. Bozin further testified that the day before the urinalysis test, he attended a party at the home of Staff Sergeant Gregory Gostomski and his wife, Jane. Tr. at 138–40. Bozin stated that he had consumed six beers before arriving at the party at noon. He proceeded to consume three more beers while at the party and then fell asleep on the couch until he left in the evening.[3]

Mrs. Gostomski testified that during the afternoon, she and some civilian friends, who did not testify, smoked three marijuana cigarettes in the living room where Bozin apparently slept. Tr. at 152–57.[4] She

---

1. The presiding military judge was detailed by the Circuit Military Judge of the Piedmont Circuit. He was certified in accordance with Article 26(b) of the UCMJ, 10 U.S.C. § 826(b) and sworn in accordance with Article 42(a) of the UCMJ, 10 U.S.C. § 842(a). Tr. at 5.

2. Bozin, on the day of testing, apparently told Warrant Officer Walter R. Hibner III that "if he ever did come up positive, ... he would contest it or request a court-martial." Tr. at 61. Officer Hibner testified that he "got the distinct impression from some of the things he was saying, that he didn't believe in the urinalysis process in the Marine Corps as it is today, anyway. [Bozin] wasn't very pleased that he had to do it." *Id.*

3. Bozin testified that he fell asleep within 15 minutes after his arrival and did not recall waking up to go to the restroom, or to eat, or for any other reason, until he left. Tr. at 139–40. Jane Gostomski recalled that Bozin left the couch for the restroom at least once, and also awoke for dinner. Tr. at 151–52, 155, 167.

4. Staff Sgt. Gostomski testified that the living room measured approximately 20 by 12 feet. Tr. at 165. It should also be noted that Sgt. Gostomski stated that he did not see his wife smoking marijuana that day. Tr. at 167.

further stated that, as a "joke," she put the burning end of a "joint" into her mouth, closed her lips, and blew smoke toward plaintiff's mouth.[5] Tr. 153–55. According to testimony, she blew this smoke toward plaintiff's mouth for forty-five seconds as he lay sleeping. Tr. at 155–56. Mrs. Gostomski also testified that she had known plaintiff for eight months and had never seen him smoke marijuana. Tr. at 154.

The smoking of marijuana in the Gostomski home was corroborated by other witnesses. Corporal Michael L. Gish testified that he was playing horseshoes in the Gostomski yard but saw and smelled marijuana smoke as he passed through the living room. Tr. at 111–15. Sergeant Thomas L. Cox and Staff Sgt. Gostomski also testified that they smelled marijuana smoke that day. Tr. at 131, 163–64. None of these individuals testified that they saw anyone actually smoking it. *Id.* According to plaintiff's testimony, he was unaware that he had been "shot gunned" at the party until Mrs. Gostomski related the incident to him three or four weeks before trial. Tr. at 144.[6]

In his defense, plaintiff called an expert, Dr. W.J. Cooke, to testify about Bozin's urinalysis results, the potential for passive inhalation of marijuana smoke and variables which may affect a positive test result from passive inhalation, such as cigarette smoking and dehydration through alcohol consumption. Tr. 174–204. Dr. Cooke stated that a scientific "possibility" existed that a positive test result under DOD criteria could result from the circumstances described by Mrs. Gostomski. Tr. 195–96.

The government, in turn, called to the stand a Dr. L.L. Pitts, who testified that it was "extremely unlikely" that anyone sleeping in the Gostomski living room, under the conditions described, would have tested positive under the DOD drug screening criteria. Tr. at 220.

Additionally, there was evidence regarding plaintiff's credibility. On rebuttal, Gunnery Sergeant Guerra, Master Sergeant Goodman and Lieutenant Thomas, all of whom had known Bozin from eight to sixteen months and had worked with him, testified as to their opinion of plaintiff's truthfulness. Each of these individuals stated that he would not believe plaintiff if he testified under oath. Tr. at 208–15. Plaintiff called Harry Edward Palmer, a retired Sergeant Major who had known Bozin for about a year through contact at a gym. Palmer testified that plaintiff had a good reputation in the community for truthfulness. Tr. at 237–38.

At one point during closing argument, the government counsel referred to Bozin's testimony as "lies."[7] Tr. at 265. The defense objected to this statement as improper. In a brief recess, the military judge did not agree that the statement constituted an improper argument but directed government counsel to "stay away from such characterizations."[8] Tr. at 266. No other objections to the prosecutor's argument are indicated in the record. Neither side objected to the trial court's instructions, or requested additional instructions. Tr. at 275.

---

5. This act is described in the record as "shot gunning." Mrs. Gostomski testified that the idea behind the procedure is to produce "more of a high" for the inhalant. Tr. at 153. In this instance, according to Mrs. Gostomski, the purpose behind "shot gunning" plaintiff was a joke. *Id.*

6. Mrs. Gostomski stated that she first told the "shot gunning" story to Bozin a week or so before trial. Tr. at 159.

7. The prosecution stated, ". . . inconsistencies is not what I meant to convey when I talked about these statements and [Bozin's] testimony. What I meant to convey was, lies . . . [interruption by defense counsel]." Tr. at 265.

8. The judge stated: "Well, I can't recall any military cases, that that is per se, improper argument, however, it does border and can have a cumulative effect as constituting inflammatory argument and I would prefer that you would stay away from such characterizations as lying. I'm not going to grant any sort of a mistrial. I'm not really even going to give a curative instruction, however, I am going to direct counsel to stay away from such characterizations at this point. Very well, anything more that we need to cover before we bring them in? [negative response]." Tr. at 266.

Plaintiff was convicted. On December 23, 1985, the United States Navy-Marine Corps Court of Military Review affirmed the sentence, stating in part:

Appellant alleges that the evidence failed to establish his guilt beyond a reasonable doubt. We disagree. The Government presented evidence that appellant's urine was properly tested and showed positively the presence of a marijuana metabolite, THC. This Court has found that urinalysis results alone are sufficient to prove beyond a reasonable doubt the wrongful use of marijuana. *United States v. Harper*, No. 84 2334 (NMCMR 10 September 1984), *pet. granted*, 20 M.J. 331 (C.M.A.1985). Once the Government presents evidence of use, such use may be inferred to be wrongful and knowing. An accused then has the burden of going forward with evidence of the absence of knowledge. Para. 37c(5), Part IV, *Manual for Courts-Martial, 1984.* In the case *sub judice*, appellant presented evidence that he did not remember using marijuana and that a friend had, without his permission or knowledge, blown marijuana smoke into his mouth while he was sleeping. The Government, in rebuttal, presented opinion testimony of appellant's untruthfulness and expert testimony of the extreme improbability that the circumstances presented by appellant would have resulted in a positive urinalysis result. In addition, several of appellant's own witnesses gave conflicting testimony concerning the events upon which appellant based his defense, thereby further discrediting his story. We therefore find that the Government presented evidence of sufficient weight to justify an inference of knowing and wrongful use of marijuana and to rebut appellant's incredible testimony to the contrary.

Appellant also contends that the punishment awarded him was excessive. We again disagree. We find a bad-conduct discharge appropriate for a staff noncommissioned officer (E–6) in the Marine Corps with a prior special court-martial conviction who is convicted of using marijuana.

Accordingly, the findings of guilty and sentence, as approved on review below, are affirmed.

Slip Op. at 2. On April 6, 1986, the United States Court of Military Appeals denied plaintiff's petition for a grant of review.

## III. DISCUSSION

### A. *Term of Office for Military Judges*

■ Plaintiff contends that he was denied due process since the military judges, who heard his case at the trial and appellate levels, were not serving for a fixed term of years. Plaintiff correctly notes that due process requires a judge to be fair and impartial and that this doctrine typically is raised where elements of judicial prejudgment exist toward a particular litigant or issue. Plaintiff does not allege, however, that there was any evidence of this type of judicial prejudgment in his case. Plaintiff's objections are more structural. Specifically, plaintiff asserts that "a judge who has no guaranty that he or she will serve either for life or for a fixed period lacks the independence required by the due process clause for criminal cases." [9] Plaintiff's Motion for Partial Summary Judgment at 20.

The Court rejects plaintiff's argument for a number of reasons. Plaintiff's argument suggests that all courts-martial are, and have been, unconstitutional since no military judge serves a term of years. The Court notes that some commentators have criticized this aspect of military justice.[10] Indeed, plaintiff's counsel has written his own article on the very subject. *See* Fidell, *Judicial Tenure Under the Uniform Code of Military Justice*, 31 Fed.B.News & J. 327 (1984).

Nevertheless, this Court follows the direction afforded by history and the Su-

---

**9.** Plaintiff notes that a military judge is subject to decertification as a judge or transfer to other duties at the discretion of the Judge Advocate General of his armed force. *See* Cook, *Courts-Martial: The Third System in American Criminal Law,* 1978 So.Ill.L.J. 1, 17–18.

**10.** *See* Note, *Service-Connection and Drug-Related Offenses: The Military Courts' Ever Expanding Jurisdiction,* 54 Geo.Wash.L.Rev. 118, 125 (1985); Pitkin, *The Military Justice System: An Analysis from the Defendant's Perspective,* 29 JAG 251 (1977).

preme Court. The Supreme Court has long recognized that military and civilian judicial processes are inherently different. A significant example of this difference is that military tribunals were created as a "special system" independent of Article III of the Constitution. *See Palmore v. United States,* 411 U.S. 389, 404, 93 S.Ct. 1670, 1679, 36 L.Ed.2d 342 (1973) (courts-martial are not Art. III courts, but are "constitutional instruments to carry out congressional and executive will"); *Schlesinger v. Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1312, 43 L.Ed.2d 591 (1975) ("The military is 'a specialized society separate from civilian society' with 'laws and traditions of its own [developed] during its long history.' Moreover, 'it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise....'" To prepare for and perform its vital role, the military must insist upon a respect for duty and a discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history; but they are founded on unique military exigencies as powereful now as in the past." (citations omitted)); *Dynes v. Hoover,* 61 U.S. (20 How.) 65, 79, 15 L.Ed. 838 (1857) (congressional power to provide for military trials is entirely independent of Art. III of the Constitution).

In accordance with the principle that military courts do not fall within the dictates of Article III, military judges do not serve for a term of years. Indeed, military judges throughout American history have never been tenured or appointed for a term. *See* Fidell, *Judicial Tenure* at 329; *see also Handlin v. Wickliffe,* 79 U.S. (12 Wall.) 173, 175, 20 L.Ed. 365 (1870) (military appointment of judge subject to revocation whenever necessary or expedient). In express language, the Supreme Court, in holding that military courts had no jurisdiction to try a civilian, reflected on the tenure differences between military and civilian judges and approved these differences. In *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955), the Court discussed the following:

... [C]onceding to military personnel that high degree of honesty and sense of justice which nearly all of them undoubt-

edly have, it still remains true that military tribunals have not been and probably never can be constituted in such way that they can have the same kind of qualifications that the Constitution has deemed essential to fair trials of civilians in federal courts. For instance, the Constitution does not provide life tenure for those performing judicial functions in military trials. They are appointed by military commanders and may be removed at will. Nor does the Constitution protect their salaries as it does judicial salaries. Strides have been made toward making courts-martial less subject to the will of the executive department which appoints, supervises and ultimately controls them. But from the very nature of things, courts have more independence in passing on the life and liberty of people than do military tribunals.

■ This Court finds that there is no constitutional requirement that military judges have any tenure guarantee. The Supreme Court has never recognized such a constitutional requirement. Even for civilians charged with a criminal offense, there is no federal constitutional right to be tried before judges with tenure and salary guarantees. *Palmore,* 411 U.S. at 391, 93 S.Ct. at 1673. The same is true for military personnel. Moreover, Congress has "plenary control" over the procedures used for military discipline. *Chappell v. Wallace,* 462 U.S. 296, 300–01, 103 S.Ct. 2362, 2365–66, 76 L.Ed.2d 586 (1983). As the Supreme Court stated in *Palmore,*

Under its Art. I, § 8, cl. 14, power "[t]o make Rules for the Government and Regulation of the land and naval Forces," Congress has declared certain behavior by members of the Armed Forces to be criminal and provided for the trial of such cases by court-martial proceedings in the military mode, not by courts ordained and established under Art. III. Within their proper sphere, courts-martial are constitutional instruments to carry out congressional and executive will. *Dynes v. Hoover,* 20 How. 65, 79, 82 [15 L.Ed. 838] (1857).

*Palmore,* 411 U.S. at 404, 93 S.Ct. at 1679. This Court does not intend to usurp Con-

gress' plenary authority to structure the "military mode" of court-martial proceedings and to govern the armed forces. *See Rostker v. Goldberg*, 453 U.S. 57, 70, 101 S.Ct. 2646, 2654, 69 L.Ed.2d 478 (1981).

■ In sum, plaintiff was not deprived of his due process rights because the military judge conducting his trial did not serve a term of years. The Court would simply note that the question of whether such job security should be afforded to military judges is a policy matter best addressed by the legislative branch.[11]

#### B. *Proof Beyond a Reasonable Doubt*

Plaintiff correctly notes that in courts-martial the burden is upon the United States to prove the accused's guilt beyond a reasonable doubt. 10 U.S.C. § 851(c) (1985). There is no contention that the members of the court in this case were improperly instructed regarding this burden. The Military Judge's instructions advised the members that:

> The burden is on the prosecution to establish the guilt of the accused. If you are satisfied beyond a reasonable doubt that the accused was not ignorant of the fact that he was using marijuana, the defense of ignorance does not exist.

Tr. at 270–71. The judge further instructed the members on the permissibility of inferring that the accused's use of marijuana was wrongful:

> [E]vidence has been introduced that marijuana metabolite was present in urine, alleged to be that of the accused. Based upon this evidence, you may justifiably infer that the accused wrongfully used marijuana. The drawing of this inference is not required and the weight and

effect, if any, will depend upon the facts and circumstances, as well as all evidence in the case.

Tr. at 272; *see also* Tr. at 270.

Plaintiff did not object to these instructions at trial. Tr. at 275. Nevertheless, plaintiff now argues two points: that a permissive inference of wrongful use was invalid after the defense had put forward evidence showing non-wrongful use and that, in light of the defense showing, prosecution had a further duty to furnish specific rebuttal evidence that plaintiff's use of marijuana was wrongful.

Plaintiff was convicted under article 112a of the UCMJ, which applies to those "wrongfully" using marijuana.[12] *The Manual For Courts-Martial*[13] *("Manual")* discusses the term "wrongfully" as used in section 112a of the UCMJ. *Manual*, Executive Order No. 12473 (1984). Both parties focus their arguments upon whether the direction supplied in the *Manual* was followed at trial. The *Manual* provides that use of marijuana, or another controlled substance, is not wrongful if done without knowledge of the contraband nature of the substance, *e.g.*, where a person possesses cocaine but believes it to be sugar. *Manual* at IV–64. The *Manual* further allows a "permissive inference" of wrongfulness as flowing from proof of drug use. The *Manual* states,

> Possession, use, distribution, introduction, or manufacture of a controlled substance may be inferred to be wrongful in the absence of evidence to the contrary. The burden of going forward with evidence with respect to any such exception [*e.g.*, unknowing use] in any court-mar-

---

**11.** Congress has responded to criticism of judicial independence in the military by establishing a DOD commission to study and report on "[t]he effectiveness of the present systems for maintaining the independence of military judges and what, if any, changes are needed ... including a term of tenure for such judges consistent with efficient management of military judicial resources." Military Justice Act of 1983, Pub.L. No. 98–209, § 9(b)(3)(D), 97 Stat. 1393, 1405 (codified at 10 U.S.C. § 867 note (1985)). Congress must be permitted to conclude its study of this issue.

**12.** Article 112a provides, in pertinent part:

(a) Any person subject to this chapter [10 U.S.C.S. §§ 801 *et seq.*] who wrongfully uses ... a substance described in subsection (b) shall be punished as a court-martial may direct.
(b) The substances referred to in subsection (a) are the following:
  (1) ... marijuana....
10 U.S.C. § 912a (1985).

**13.** The *Manual for Courts-Martial* was prescribed by the President of the United States by virtue of Chapter 47 of Title 10 of the United States Code and the Constitution of the United States.

tial or other proceeding under the code shall be upon the person claiming its benefit. If such an issue is raised by the evidence presented, then the burden of proof is upon the United States to establish that the use, possession, distribution, manufacture, or introduction was wrongful.

*Id.*

■ The Court concludes that the government met its burden of proof. First, the Court rejects plaintiff's suggestion that an inference of "wrongful" use was entirely impermissible after the defense put forward evidence of unknowing use. The Court's conclusion is based on several recent cases directly on point. In *United States v. Ford*, 23 M.J. 331 (C.M.A.1987), the United States Court of Military Appeals addressed the issue of whether the results of urinalysis tests alone sufficiently support a "permissive inference" of wrongfulness beyond a reasonable doubt, even though the accused subsequently introduced evidence which purportedly undermined or contradicted that inference. The accused in *Ford* asserted that he had no knowledge of using or ingesting marijuana. He explained the test results by suggesting that the laboratory had made a mistake, or that he had unknowingly ingested marijuana planted in his food by his estranged wife.[14] *Id.* at 332. Several witnesses testified that they observed no abnormal behavior by the accused which would suggest drug abuse. *Id.*

After extensively reviewing the language creating the permissive inference of wrongfulness in the *Manual, supra,* the past practice at courts-martial with respect to earlier versions of the *Manual* and the related federal practice concerning permissive inferences, the Court in *Ford* summarized:

> [W]hether to draw an inference of wrongfulness is a question to be decided by the factfinder using the standard of reasonable doubt. It *may* be drawn where no contrary evidence is admitted. However, if the prosecution fails to per-

suade the factfinder beyond a reasonable doubt that this inference should be drawn, a finding of not guilty is required. Similarly, the inference of wrongfulness *may* be drawn where contrary evidence is admitted. However, if the prosecution fails to persuade the factfinder beyond a reasonable doubt that this contrary evidence should be disbelieved or that the inference should otherwise be drawn, a finding of not guilty is required.

*Id.* at 335 (emphasis in original). The court's instruction to the military jury substantially tracked this language. Tr. at 270.

In application of the principles summarized above, the Court in *Ford* held that the defendant's evidence regarding his unknowing ingestion of marijuana did not *per se* bar drawing an inference of wrongfulness or require the prosecution to introduce evidence that the defendant's wife did not secretly plant marijuana in the defendant's food. *Id.* at 336. "Instead, the prosecution had to persuade the members beyond a reasonable doubt on credibility and probability grounds that [the accused's] evidence should be disbelieved and the inference [of wrongfulness] should nonetheless be drawn and given such weight to find knowledge beyond a reasonable doubt." *Id.*

In *Ford,* the Court further held that an inference of wrongfulness *alone* was sufficient to support a finding of wrongfulness beyond a reasonable doubt. *Id.* In so holding, the Court reflected upon several factors: (1) that the inference is predicated on a finding of drug use by a service member which is not satisfactorily explained to the factfinder; (2) that a service member's access to contraband is limited and thus the probability of innocent ingestion is greatly reduced; (3) that the probability of innocent ingestion of drugs is further reduced by the fact that service members are on notice, through well publicized military directives, to avoid any and

14. The accused in *Ford* offered a witness who testified to the marital unhappiness of the accused's wife, her unhappiness with military life, her occasional possession of marijuana and her opportunity to plant this substance in the food of the accused. *Ford,* 23 M.J. at 332.

all contact with contraband; (4) that the physiological effects from the internal presence of the drug in the body may serve to alert the user and may increase the likelihood of knowing drug use where no satisfactory explanation exists; and (5) that human experience generally dictates that any human knows what he consumes. *Id.* at 337.

Applying the *Ford* reasoning to the case at bar, the Court finds that a permissive inference of wrongfulness remains valid even in the face of evidence of non-wrongful drug use. Additionally, the Court finds that the factfinder was permitted to rely upon the permissive inference of wrongfulness *alone* in finding wrongful use of marijuana beyond a reasonable doubt. The *Ford* holding is well supported by logic and precedent. *See United States v. Harper,* 22 M.J. 157, 163 (C.M.A.1986) (permissive inference of wrongful use of marijuana valid where prosecution witness ruled out passive inhalation and evidence suggested accused "knew what he was doing"); *United States v. Douglas,* 22 M.J. 891, 893 (A.C.M.R.1986) (consideration of permissive inference of wrongfulness not foreclosed even though accused introduced unrebutted evidence that he unknowingly ingested marijuana after eating cake into which marijuana had been baked). Accordingly, the government had no "burden of going forward" with evidence of wrongfulness after plaintiff introduced evidence of unknowing drug use. This conclusion is further bolstered by a literal reading of the *Manual.* The *Manual* indicates only that the "burden of proof" remains with the prosecution; nowhere does the *Manual* mention that the prosecution has an additional burden to come forward with evidence rebutting a defense of unknowing use of drugs.

■ Moreover, the government did submit evidence undermining Bozin's passive inhalation story. Several witnesses testified that they would not believe plaintiff under oath. Tr. at 208–15. Additionally, on rebuttal, the government presented an expert who testified that exposure to marijuana in the circumstances related by Mrs. Gostomski would not account for the level of marijuana in Bozin's urine. Tr. at 220.

In view of this and other evidence, the trier of fact could have disbelieved Bozin's claim of "unknowing" drug use. *See United States v. Biesak,* 14 C.M.R. 132, 142 (C.M.A.1954) ("[A] presumption disappears only upon the presentation of evidence that the trier does not disbelieve"). In sum, a rational factfinder could hold that, beyond a reasonable doubt, Bozin wrongfully used marijuana based upon the permissive inference of wrongfulness which accompanies proof of drug use, as well as upon evidence discrediting the defense of passive inhalation.

■ The question of whether use of an illegal drug was wrongful is a question of fact. In the Supreme Court's words, "[i]nferences and presumptions are a staple of our adversary system of factfinding." *Ulster County Court v. Allen,* 442 U.S. 140, 156, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1978). With a permissive inference, the trier of fact is free to credit or reject the inference. The factfinder is not bound to accept the correctness of the inference. *Barnes v. United States,* 412 U.S. 837, 845 n. 9, 93 S.Ct. 2357, 2362 n. 9, 37 L.Ed.2d 380 (1973). A permissive inference, the type here at issue, "affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." *Ulster County,* 442 U.S. at 157, 99 S.Ct. at 2224.

■ The "rational connection" between contraband drug use and wrongfulness has been recognized for many years in military law. *See United States v. Harper,* 22 M.J. at 162 (cases cited therein). This Court finds no reason to reject that body of law. Additionally, given the record below in this case and the discussion above, the Court finds that a rational connection exists between the permissive inference of wrongfulness and the evidence of Bozin's use of marijuana.

## C. *Service-Connection*

■ Plaintiff's third argument alleges that the government did not prove beyond a reasonable doubt that the offense was

"service-connected." *See* Amended Complaint ¶ 14(b). The Supreme Court has not formulated a simple test for determining the presence, or absence, of service-connection in a given case. Instead, the Court has urged a case by case determination with attention given to certain salient factors, including whether the crime was committed off a military post; whether there was no connection between the defendant's military duties and the crime; and, whether the offense threatened military security, property or authority. In *O'Callahan v. Parker*, 395 U.S. 258, 273–74, 89 S.Ct. 1683, 1691, 23 L.Ed.2d 291 (1969), which involved the attempted rape of a civilian woman in a hotel room by an Army sergeant off duty on a pass, the Court held that the offense was not service-connected and that he should have been tried by a civilian court rather than a military court. In *Relford v. Commandant*, 401 U.S. 355, 367–68, 91 S.Ct. 649, 656, 28 L.Ed.2d 102 (1971) (footnotes omitted), the charges were also rape and were committed on base and involved the sister of a soldier and the wife of another soldier. The factors to be considered in determining the service-connected issue are stated as follows:

With the foregoing contrasting comparison of the pertinent factual elements of *O'Callahan* with those of Relford's case, we readily conclude that the crimes with which Relford was charged were triable by a military court. We do not agree with petitioner when he claims that the "apparent distinctions" between this case and *O'Callahan* "evaporate when viewed within the context of the 'service-connected' test." We stress: (a) The essential and obvious interest of the military in the security of persons and of property on the military enclave. Relford concedes the existence of this vital interest. (b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order. See *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886 [81 S.Ct. 1743, 6 L.Ed.2d 1230] (1961). Relford also concedes this. (c) The impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission. (d) The conviction that Art. I, § 8, cl. 14, vesting in the Congress the power "To make Rules for the Government and Regulation of the land and naval Forces," means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman offender and turn him over to the civil authorities. The term "Regulation" itself implies, for those appropriate cases, the power to try and to punish. (e) The distinct possibility that civil courts, particularly nonfederal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community. See W. Winthrop, Military Law and Precedents 725 (2d ed. 1896, 1920 Reprint); Wilkinson, The Narrowing Scope of Court-Martial Jurisdiction: *O'Callahan v. Parker*, 9 Washburn L.J. 193, 208 (1970). (f) The very positive implication in *O'Callahan* itself, arising from its emphasis on the absence of service-connected elements there, that the presence of factors such as geographical and military relationships have important contrary significance. (g) The recognition in *O'Callahan* that, historically, a crime against the person of one associated with the post was subject even to the General Article.

The Court concludes that there was sufficient evidence at trial to find a service-connection beyond a reasonable doubt. Bozin was tested while on duty and the amount of marijuana metabolites in his urine was more than three times the standard for a positive finding. *See* Tr. at 89–90; Prosecutor's Exhibit 7, at 3. Although plaintiff's exposure to marijuana was off base, the effects of drug use are not left behind at the marine base gate. As the U.S. Court of Military Appeals commented, "in many instances the drugs will enter the military installation in their most lethal form—namely, when they are cours-

ing through the body of a user." *United States v. Trottier*, 9 M.J. 337, 349 (C.M.A. 1980).

The criteria mentioned in Justice Blackmun's opinion in *Relford* have been considered by the military courts in determining whether the offense is service-connected. These criteria are summarized in Justice Powell's opinion in *Schlesinger v. Councilman.*

> But that issue [of service-connection] turns in major part on gauging the impact of an offense on military discipline and effectiveness, on determining whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and on whether the distinct military interest can be vindicated adequately in civilian courts. These are matters of judgment that often will turn on the precise set of facts in which the offense has occurred. See *Relford v. U.S. Disciplinary Commandant*, 401 U.S. 355 [91 S.Ct. 649, 28 L.Ed.2d 102] (1971). More importantly, they are matters as to which the expertise of military courts is singularly relevant, and their judgments indispensable to inform any eventual review in Art. III courts.

*Schlesinger, supra*, 420 U.S. at 760, 95 S.Ct. at 1314 (footnote omitted). Even if the *Relford* criteria were controlling, those designated (d) and (e) clearly justify the decision that this case be tried by a military court.

Simply put, "a servicemember is responsible to be fit for duty when he returns from leave." *Murray v. Haldeman*, 16 M.J. 74, 80 (C.M.A.1983). This Court is convinced that a service member is not fit for duty when substantial amounts of psychoactive drugs are coursing through his body. As the D.C. Circuit has noted:

> The increased incidence of drug abuse in the Armed Forces poses a substantial threat to the readiness and efficiency of our military forces. Unlike the civilian population, the military forces are charged with the responsibility of continuously protecting the nation's interests both on the domestic and international level. Widespread use of marijuana, hashish and other drugs can have a seri-

ous debilitating effect on the ability of the Armed Services to perform their mission. As noted in the extensive evidence submitted by the appellants, drug use among GIs in the USAREUR had (a) lessened the on-the-job efficiency of GIs; (b) significantly reduced the number of effective soldiers in the European command; (c) required the expenditure of enormous amounts of supervisory time to monitor all aspects of the drug control and rehabilitation process; (d) strained the limited medical resources of the European Command; (e) created a significant health threat; and (f) resulted in an increased incidence of crime.

*Committee for GI Rights v. Callaway*, 518 F.2d 466, 476–77 (D.C.Cir.1975) (footnotes omitted); *see also United States v. Beeker*, 18 U.S.C.M.A. 563, 565, 40 C.M.R. 275, 277 (1969) (use of marijuana and narcotics by military persons on or off a military base has special military significance in light of disastrous effects of these substances on health, morale and fitness for duty of the armed forces).

The Supreme Court has advised that determinations of whether an offense is "service-connected" are "matters of judgment that often will turn on the precise set of facts in which the offense has occurred ... [m]ore importantly, they are matters as to which the expertise of military courts is singularly relevant...." *Schlesinger v. Councilman, supra*, 420 U.S. at 760, 95 S.Ct. at 1314. This Court finds that upon the record before it, and in view of the military's considerable expertise on this matter, there was an adequate basis for the finding that plaintiff's use of marijuana was service-connected.

**D. *Prosecutor's Argument***

Plaintiff suggests that the military prosecutor's argument was inflammatory and prejudicial. The record reveals one objection by defense counsel to the prosecutor's reference to Bozin's inconsistent testimony as "lies." Tr. at 265. The pleadings reveal that plaintiff now contends other remarks are inflammatory, such as: that plaintiff is "antiauthority," Tr. at 256; use of the quote, "Oh, what a tangled web we weave,

when first we practice to deceive," Tr. at 257; and that if Bozin were to be believed, "virtually anyone could explain away a positive test," Tr. at 258. All of these remarks were made in the context of the prosecutor's closing argument. Tr. at 256–58, 265–68.

A prosecutor may not make statements calculated to arouse passions or prejudices of a jury. *Viereck v. United States,* 318 U.S. 236, 247, 63 S.Ct. 561, 566, 87 L.Ed. 734 (1943) (impassioned appeal to jurors' patriotism during wartime). The prosecutor "may strike hard blows, [but] he is not at liberty to strike foul ones." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). In assessing the effect of a prosecutor's remark, due respect must be accorded the jurors' common sense and discrimination. *United States v. Monaghan,* 741 F.2d 1434, 1440 (D.C.Cir.1984).

The prosecutor's remarks in this case were not highly inflammatory or prejudicial. They were confined to the closing argument after all evidence had been submitted; closing arguments "are seldom carefully constructed," and typically improvised. *Donnelly v. DeChristoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 1872–73, 40 L.Ed.2d 431 (1974). The prosecutor's characterization of statements by the defendant as "lies" has often been held to be acceptable argument. *See United States v. Spain,* 536 F.2d 170, 175 (7th Cir.1976); *United States v. Isaacs,* 493 F.2d 1124, 1166 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). It is entirely proper for a prosecutor to voice his doubt about the credibility of the defendant.[15]

■ The D.C. Circuit has outlined three salient factors in considering whether "improper" remarks by a prosecutor have substantially prejudiced a defendant's trial: "the severity of the misconduct, the measures adopted to cure the misconduct, and

the certainty of conviction absent the improper remarks." *Monaghan,* 741 F.2d at 1443 (footnote omitted). Here, the prosecutor's so called "misconduct" could hardly be characterized as "severe." Defense counsel objected once, and that was to the use of the word "lies." The military judge concluded that although such a term should not be repeated, there was no cause for a curative instruction. The record justifies the conclusion that there was adequate evidence to support the court's verdict and further, that there is no justification for this Court, based on the final remarks by the prosecutor, to intervene.

Finally, a certain degree of respect must be accorded to the military jury which included a major, a captain, a chief warrant officer and three gunnery sergeants. As one court stated:

> We think little of the words used by the prosecutor. We think they were unnecessary in an otherwise logical and convincing summation. But we quite realize as we have said before that some latitude must be given to lawyers' language in a hard fought case. To say that this remark would have a prejudicial effect on a jury which had listened throughout a long trial to the unfolding of the testimony is to attribute a stupidity and absence of common sense which is incredible in a federal jury.

*United States v. Kravitz,* 281 F.2d 581, 586 (3d Cir.1960) (footnotes omitted), *cert denied,* 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372 (1961). This Court concludes that there is no justification to find a military jury so lacking in common sense that it was misled by the prosecutor's remarks cited by plaintiff.

### E. Equal Protection Claim

■ Lastly, plaintiff amended his complaint filed in this Court to include a claim that his equal protection rights were violated. This assertion is premised on the oc-

---

15. *See United States v. Russell,* 703 F.2d 1243, 1248 (11th Cir.1983) ("A prosecutor does not commit error in attacking witness credibility on the basis of inconsistencies between his testimony and other evidence"); *United States v. Birges,* 723 F.2d 666, 672 (9th Cir.1983) ("It is neither unusual nor improper for a prosecutor to voice

doubt about the veracity of a defendant who has taken the stand. The prosecutor's interpretation of Birges' duress claim as a 'fabrication' is also well within the bounds of acceptable comment."), *cert. denied,* 469 U.S. 863, 105 S.Ct. 200, 83 L.Ed.2d 131 and 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984).

currence of President Reagan's Executive Order for a "Drug-Free Federal Workplace," Executive Order No. 12564, 51 Fed. Reg. 32889 (Sept. 15, 1986). The Executive Order authorizes the drug testing of non-sensitive civilian employees of the Federal government; it also provides that

> [d]rug testing shall not be conducted pursuant to this Order for the purpose of gathering evidence for use in criminal proceedings.

Section 5(h). The Order does not apply to the armed services. Section 7(b). Plaintiff claims that he is being denied equal protection of the law because urinalysis results from civilian employees may not be used for gathering evidence in a criminal proceeding whereas drug test results may be used as criminal evidence against a member of the armed forces.

The merits of this claim do not need to be reached. The Executive Order referenced by plaintiff was not in existence at either the time in which criminal charges were brought against plaintiff or at the time his conviction was made final in April, 1986. Since the Executive Order *postdates* the plaintiff's conviction, it is inconceivable how plaintiff may have suffered disparate treatment of the laws then in force and effect. Plaintiff does not contend that the President's Executive Order had retroactive application.

## IV. CONCLUSION

For the reasons set forth above, the Court grants summary judgment in favor of defendant on all grounds and denies plaintiff's motion for summary judgment.