Clennie Joe **BUCHANAN**, Simpson Bryan Cross, Appellants,

v.

**UNITED STATES of America,**
Appellee.

Nos. 12847, 12848.

United States Court of Appeals
Sixth Circuit.

June 13, 1957.

Dan M. Lee, Jackson, Miss., L. E. Gwinn, Memphis, Tenn., Julian W. Knippenberg, Lexington, Ky., of counsel, for appellants.

Henry J. Cook, Lexington, Ky., B. Robert Stivers, Marvin D. Jones, U. S. Attys., Lexington, Ky., on the brief, for appellee.

Before MARTIN, McALLISTER, and STEWART, Circuit Judges.

McALLISTER, Circuit Judge.

Appellants were convicted of devising a scheme to defraud by means of interstate wire, in violation of Title 18 U.S. C.A., § 1343,[1] and of conspiring to commit such offense. They were found guilty by a verdict of the jury and sentenced on five counts to a total imprison-

---

1. Title 18 U.S.C.A. § 1343: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of interstate wire, radio, or television communication, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

ment of ten years and a fine of $10,000. The verdict was supported by the evidence.

On appeal, it is submitted that, in its comments and charge to the jury, the trial court committed reversible error which calls for a new trial.

The government contends that the trial judge had the right to comment on the evidence and that, in so doing, stayed within the bounds of sound discretion in referring to the facts in issue; and that he repeatedly told the jury that it alone was the judge of the credibility of the witnesses and the weight of the evidence. In this regard, appellants submit that the remarks of the trial judge to the jury exceeded the bounds of fair comment; that his charge partook of the nature of advocacy; and that he erred in calling the jury's attention to the fact that one of the defendants had not taken the stand to testify.

The transaction which gave rise to the indictment was the conventional type of swindle. Kenneth and Robert Close, the victims of the swindle, were brothers, and businessmen operating a trailer factory in Toledo, Ohio. The alleged swindlers are appellants Buchanan and Cross of Jackson, Tennessee. The Close brothers had known Cross in Toledo, where the latter had conducted a jewelry business.

The following is the undisputed testimony adduced by the government, with a few exceptions hereinafter pointed out. On June 11, 1955, appellants came to see the Close brothers in Toledo. Cross introduced Buchanan, as "George." Both of the alleged swindlers told the Close brothers that they knew of a man in Mississippi who had in his possession $230,000 in thousand dollar bills; that, in an income tax case, this man had testified that he had no thousand dollar bills in his possession; that he was worried that they would be discovered; that he wished to get them changed into bills of small denominations, and so dispose of them; and that there was no way that he could dispose of them except to sell them at a discount. Appellants Buchanan and

Cross told the Close brothers that the thousand dollar bills could be purchased at 60¢ on the dollar. The Close brothers were interested in the proposition, but told appellants that they did not know where they could arrange to get the money, and that appellants would have to see them later. A few days after this meeting, appellant Cross telephoned Kenneth Close and informed him that they could get a certain amount of the money, and that Cross would see him later, or call him. Appellant Cross had told the Close brothers that he himself was going to exchange $10,000 in bills of smaller denomination for thousand dollar bills at the same discount. Subsequently, a tentative date of July 25 was arranged for the exchange of the bills of smaller denomination for $100,000 in thousand dollar bills, but the date was finally changed to July 28, when the Close brothers were to meet Cross and Buchanan at the airport at London, Kentucky, at which time the Close brothers would bring $50,000 in bills in smaller denomination to exchange for the thousand dollar bills at 60¢ on the dollar. On July 28th Kenneth Close secured $50,000, mostly in $100 bills, in Toledo, from his bank and from a friend. The Close brothers then secured a private plane and, after some delays, arrived at the London, Kentucky airport at 3 P.M. After they alighted from the plane, they were met by Cross and the three men then walked over to a blue Cadillac, where Buchanan was sitting in the front seat with his driver. The Close brothers and Cross then entered the rear seat. Buchanan handed Cross a brown manila envelope and told him to place his $10,000 in it and also instructed the Close brothers to put their $50,000 in it. They complied with this request. But when they learned that no thousand dollar bills had been brought to the airport, Robert Close became suspicious and asked Cross to give him the envelope containing his money; but before the Close brothers could get out of the automobile with the envelope containing their money, Buchanan, from the front seat, grabbed the

envelope from the hands of Robert Close and told him not to be excited, because nothing was going to happen. Buchanan then proceeded to mark an X with his fountain pen at the top of the envelope where it was sealed, and as Buchanan was marking the envelope containing the money, he let it drop to the front seat or floor. He then immediately picked up an identical envelope and handed it to appellant Cross with the remark that "There is nothing to worry about. Your money is with Steve Cross." Buchanan then suggested that if the Close brothers and Cross would get out of the car, he would go and get the thousand dollar bills. Kenneth Close and appellant Cross, who had the manila envelope, which it was pretended contained the money, got out of the car. Robert Close, however, insisted that their $50,000 was still inside the automobile and refused to get out. Buchanan then said he would take Robert Close to town to get the man with the thousand dollar bills. The driver of the car and Buchanan and Robert Close then drove away, and when they reached a point out of sight of the airport administration building, Buchanan pulled a pistol from the glove compartment and forced Robert Close from the car at gun point.

Back at the administration building, Kenneth Close became suspicious and asked Cross to let him see the envelope which he was holding. Cross replied: "No, don't worry about it." But Kenneth Close grabbed the envelope, tore it open and found that it contained nothing but old newspaper clipped to the size of paper currency. About this time Robert Close had run back to the administration building. They had yelled to the airport officials that they had been robbed and a Deputy Sheriff, who soon arrived, arrested not only appellant Cross, but the two Close brothers, "on the charge of suspicion." Later the brothers were released. Cross was held. Buchanan escaped, but was later arrested. None of the $50,000 brought by the Close brothers to the Buchanan car was ever recovered.

The only difference in the foregoing account, as disclosed by the testimony, is the unlikely story told by appellant Cross on the witness stand. He testified that the Close brothers, themselves, brought along an empty manila envelope; that when they got in the Buchanan car, they asked Cross to put his $10,000 in the envelope and gave the envelope to him; that Cross then gave back the envelope to the Close brothers, at which time they put their $50,000 in it; that Robert Close then sealed it and wrote an X upon it; that Robert Close then gave the envelope to Kenneth Close; that Robert said that he would like to see the man who had the $1,000 bills to see whether he would take a check in payment, instead of the currency which they had brought; that for some inexplicable reason, Robert then made out a check for $60,000, payable to appellant Cross, who, by the way, claimed he did not know the man with the $1,000 bills, nor did he even know who he was; and that then Buchanan and Robert Close told Kenneth Close and Cross to get out of the car and stay there until they returned. According to this story, Buchanan never got hold of the manila envelope with the currency and Kenneth Close, with the envelope, in his hands, got out of the car when Cross did. Later, when Kenneth tore open the envelope which, appellant Cross says, had been always in his possession from the time the money was placed in it, it was then found filled with newspaper cut into the shape of currency.

Cross had a felony record. He admitted having used so many names during the period of the alleged swindle that he testified he could not remember more than one or two of them. His testimony was directly contradicted on important points, as to what he had said after his arrest, by the County Attorney of Laurel County, Kentucky, and the Special Agent of the Federal Bureau of Investigation. The evidence disclosed, and Cross admitted, that he had been engaged in trying to arrange for the sale of $1,000 bills at 60¢ on the dollar, to other persons

before, up to, and even including, the time when he began negotiations with the Close brothers. Buchanan did not take the stand. The evidence of appellants' guilt could be found, by the jury, to be convincing in almost every aspect of the proofs.

We have examined the claims of error with regard to the trial court's overruling appellants' motion for acquittal, the refusal to allow counsel to ask certain questions of the jury during the voir dire, the refusal of requests to instruct, the overruling of objections to the testimony of government witnesses; and we find no prejudicial error therein.

The crucial question is whether the charge of the trial court constituted an invasion of the province of the jury, and went beyond permissible comment on the facts, to the point of an argument against appellants.

In the case at bar, the district court, commencing his comment, told the jury that before he did so, he wanted to say to the members of the jury "with all the emphasis that I can, that it is not the function or purpose of the court to bind [or] control the jury by anything the court might say about the facts. As I have already said to you, you are the judge and determine the credibility of witnesses, you are to judge and determine the weight to be given to this man's statement or the other, and any comment or statement or expression that the court may make is not in any respect binding on you except such of the suggestions or comments that are made as you think in your conscience are worthy of accepting. Anything else you will discard and feel no duty to accept."

The trial judge thereafter went on in the course of his instructions to refer to what he considered significant facts and stated: "The most significant fact to me, in respect to Mr. Cross' claim is, first, he, with Mr. Buchanan, came down here to London several days before the thing was accomplished, stayed around here conferring, looking over the ground, planning for it. Did he ever say that either he or his associate, Mr. Buchanan, ever brought to London a single thousand dollar bill to exchange with the Close brothers? 'Oh, I was one of the men that was going to buy.' 'Didn't you ever ask Mr. Buchanan where the thousand dollar bonds were? You rode out with Mr. Buchanan to the airport. Where was the $100,000 in bonds?' The only thing that they had in that automobile, so far as this evidence shows, was a package filled with newspapers. That's all.

"Well, Mr. Cross, the facts developed in this case, which cannot be disputed, are that you were one of the men—both of you were staying here in London at these tourist courts for several days before this thing happened, which, taken by itself, wouldn't be disturbing particularly unless it was for the purpose of planning, laying out the ground, to execute this scheme to defraud and to get away before it was discovered. What did they do during those days they were here? They haven't told us. Neither of them has said what their purpose was in coming here, I believe on the 24th. I believe that Mr. Buchanan was here before that, according to the testimony. He was here on the 8th of July and was registered out there at the Southmoor Motel, he and the lady with him, as a Mr. and Mrs. Andrews. Why, gentlemen, could there be anything more significant of some ulterior purpose than to stay here under assumed names? * * * [On] the 26th, for some strange reason, they were at the Village Motel here in London. Mr. Buchanan had come there and his driver had rented a room in the name of Jim Gross. I don't know whether that was a fictitious name or not. He hasn't appeared here to give us any information about it." Referring to a conference by the other alleged conspirators with appellant Buchanan, the court said: "Do you believe what they say about it? Was that conference for the purpose of devising a plan to get away with that Cadillac car, which was the most effective way of identifying escaping persons? That big car, with the Mississippi tag on it, was easily seen

going down the highway, wasn't it? Have they explained that? * * * [We] are, as reasonable men, able to understand that if these men were trying to effectuate this fraudulent scheme, this great big swindle of $50,000, then perhaps the most important thing to them was to get rid of this big car and get away. Isn't that right? They didn't have much trouble getting hold of this $50,000. These Close brothers seemed to be pretty gullible. The thing was to get away. * * * Mr. Buchanan was in a terrible hurry to get away, wasn't he? * * * I can't say who made it possible for Mr. Buchanan and whoever else was with him to disappear from London that night. I don't know why he was in such a big hurry. He hasn't told us. Nobody has told us. But that was the last seen of Mr. Buchanan. * * * I suppose Mr. Buchanan—I don't know whether he was the brains of this thing or not, but I suppose anybody who ever engaged in this character of thing, would be making every effort to get away as soon as it was over, before the newspapers came out the next morning."

The court further told the jury that "You may not consider for any purpose the failure of Mr. Buchanan to testify as a witness in this case. A man doesn't have to prove his innocence. He can keep his mouth shut. Mr. Buchanan had a perfect right and don't attribute anything to him of an unfavorable nature because he didn't testify."

█ The court cannot direct a verdict of guilty in criminal cases, even if the facts are undisputed. Dillon v. United States, 2 Cir., 279 F. 639. It cannot do indirectly what it cannot do directly, and by its instructions in effect advocate such a verdict of guilty. We are v. United States, 8 Cir., 1 F.2d 617. Where the trial judge undertakes to sum up and comment on the evidence, and his comments are in the nature of an argument to the jury, he thus assumes the role of an advocate; and this is error, as established by repeated decisions. Minner v. United States, 10 Cir., 57 F.2d 506.

In spite of the trial court's instructions that appellants were presumed to be innocent until that presumption had been overcome by proof sufficient to establish guilt beyond a reasonable doubt; that no inferences should be drawn against appellant Buchanan because of his failure to testify; and although the trial judge cautioned the jury that he was only expressing his opinion and that the jury was not to be influenced by it: we are of the view that the court's comment on the evidence nullified, or may well have nullified, the instructions given.

█ It is unfortunate that in such a case an appellate court is required to set aside a judgment on the ground that one of the most experienced, able and fair-minded of judges exceeded permissible comment on the evidence. But the very character of such a judge, and the high respect in which he is held in the community, cause his words to be received with far greater deference than another's; and when they partake of the nature of advocacy, they result in error that, according to the repeated decisions of the courts, call for reversal.

The judgment is, accordingly, set aside and the case remanded for a new trial.