NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 25a0316n.06

Nos. 22-6114/6121/23-5029/5560/5561/5563

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Jun 26, 2025 |
| Plaintiff-Appellee, | ) | KELLY L. STEPHENS, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
|  | ) |  |
| RICHARD RICHARD G. MAIKE (22-6114/23-5563); DOYCE G. BARNES (22-6121/23-5561); FARADAY HOSSEINIPOUR (23-5029/5560), | ) |  |
|  | ) | UNPUBLISHED APPENDIX |
| Defendants-Appellants. | ) |  |
|  | ) |  |

Before: McKEAGUE, KETHLEDGE, and NALBANDIAN, Circuit Judges.

KETHLEDGE, Circuit Judge. "When a party comes to us with nine grounds for reversing the district court, that usually means there are none." *Fifth Third Mortg. Co. v. Chicago Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012). The defendants here come to us with several times that number, with the same result. This unpublished appendix addresses the arguments we chose not to address in today's published opinion. *See United States v. Barnes*, -- F.4th --- (6th Cir. 2025).

I.

As we discussed at greater length in the published opinion, Infinity 2 Global (I2G) was a pyramid scheme that operated from February 2013 until December 2014. The defendants were three of its leaders: Richard Maike was the president, Doyce Barnes was the vice president for sales, and Faraday Hosseinipour was a top distributor. In 2022, a jury convicted the trio of conspiracy to commit mail fraud and conspiracy to commit securities fraud, and convicted Maike

of money laundering and tax evasion. They challenge those convictions. Barnes also challenges his sentence, and Maike challenges an order that he pay restitution.

II.

A.

The defendants first challenge various aspects of the jury instructions as well as the court's answer to a jury question. We review jury instructions for an abuse of discretion, though we review their legal accuracy de novo. *United States v. You*, 74 F.4th 378, 391 (6th Cir. 2023).

1.

Barnes and Hosseinipour argue that the court's instruction about good faith was legally inaccurate. If a defendant believes, in good faith, that his false or misleading statements were true, he cannot form an intent to defraud. *See United States v. Daniel*, 329 F.3d 480, 488 (6th Cir. 2003). But a good-faith belief that a venture will ultimately succeed does not excuse false statements that a defendant makes to induce others to join that venture. *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013). Here, the court instructed the jury that a defendant's belief "that the venture will eventually meet his or her expectations" did not constitute the sort of good faith that vitiates the defendant's intent to defraud. We have upheld the legal accuracy of this very instruction for at least 40 years—because "no matter how firmly the defendant may believe in the plan, his belief will not justify baseless, false, or reckless representations or promises." *See United States v. Stull*, 743 F.2d 439, 446 (6th Cir. 1984) (citation omitted). The defendants here may have genuinely believed in their scheme's potential to succeed; but if they deceived others in pursuit of that potential, they conspired to commit fraud. *See* Sixth Cir. Pattern Crim. Jury Instr. § 10.04(3) (2023). The court's instruction on this point was accurate.

2.

Barnes and Hosseinipour next argue that the district court's instruction defining "intent to defraud" as an intent to "cheat or deceive" was improper because the instruction did not also say that the scheme must deprive someone of something. *See Shaw v. United States*, 580 U.S. 63, 72 (2016). But this argument simply ignores the second half of the sentence that they contend is problematic. The court said that, to convict the defendants, the jury must find that they acted "with an intent to deceive or cheat for the purpose of depriving another of money or property." We therefore reject this argument.

3.

Barnes and Hosseinipour lodge one further objection to a jury instruction. They did not raise this objection at trial, however, so we review it only for plain error. *See United States v. Morrison*, 594 F.3d 543, 546 (6th Cir. 2010). These defendants now argue that an instruction that referred to "victim-investors" improperly commented on the evidence "in a manner that implies guilt." *See Buchanan v. United States*, 244 F.2d 916, 920 (6th Cir. 1957). We grant that the term "victim" implies that some wrong occurred. But one ill-advised word did not make these jury instructions, taken as a whole, "so clearly erroneous as to likely produce a grave miscarriage of justice." *Morrison*, 594 F.3d at 546. We thus hold that the district court made no error, plain or otherwise.

4.

Finally, all three defendants argue that the court erred in its answer to a jury question. We review answers to jury questions for an abuse of discretion and uphold them unless, taken as a whole, the answers rendered the jury instructions "confusing, misleading, and prejudicial." *United States v. Fisher*, 648 F.3d 442, 447 (6th Cir. 2011). Here, the jury asked whether it could "use the

evidence from the whole case to determine if the positions sold are/were a security" or whether it was limited to considering "just the purchase within the statute of limitations." The court responded: "You are permitted to use any evidence which you deem appropriate to consider whether the positions sold are/were a security. You are not limited to the evidence regarding the purchase within the statute of limitations." The defendants contend that this response implied that a purchase had, in fact, occurred within the statute-of-limitations period—a factual question that was in dispute. But the court's response simply quoted the language from the jury's question, which itself implied that the jury had already determined that a purchase had occurred within the statute of limitations. The answer was thus neither confusing, nor misleading, nor prejudicial—so the court did not abuse its discretion.

B.

The defendants next argue that the prosecution for conspiracy to commit securities fraud was time-barred. To convict a defendant of that offense, a jury must find that the defendant, or a co-conspirator, committed an overt act that occurred within the five-year statute of limitations and that was alleged in the indictment. *See United States v. Smith*, 197 F.3d 225, 228 (6th Cir. 1999); *see also* 18 U.S.C. § 3282. Here, the grand jury returned the second superseding indictment on November 13, 2019, so an overt act must have occurred after that date in 2014. Although the indictment listed 20 sales, 19 took place before November 13, 2014. The twentieth sale—to an investor known as S.H.—occurred on November 25, 2014.

The crux of the defendants' argument is that this November 25 sale actually occurred in October, when S.H. wired his money to I2G distributor Scott Magers. But Magers did not deposit those funds into an I2G bank account until November 25, which is when S.H. became an Emperor. And the "case law gives ample support to the proposition that payment is an integral and often

final term in a conspiracy." *United States v. Schaffer*, 586 F.3d 414, 424 (6th Cir. 2009) (cleaned up). The exchange of funds is a two-sided transaction: on one side the payment and on the other the receipt of those funds. I2G's receipt of those funds was therefore an overt act that occurred within the statute-of-limitations period. Maike also contends that I2G's receipt of payment does not count as an overt act because that act was not itself criminal. But an act need not be criminal to count as an overt act in furtherance of a conspiracy. *Braverman v. United States*, 317 U.S. 49, 53 (1942). Maike's arguments are meritless.

Meanwhile, Barnes and Hosseinipour also argue that the jury instructions permitted the jury to convict without finding that this final sale had occurred. The court's instruction said, "For you to return a guilty verdict on the conspiracy charge in Count 13, the government must convince you beyond a reasonable doubt that at least one overt act was committed for the purpose of advancing or helping the conspiracy after November 13, 2014." That same instruction's list of overt acts included only one act that had occurred after that date. Hence the jury could not convict the defendants without finding that this final sale had occurred.

## C.

The defendants next challenge the district court's failure to give an instruction that limited how the jury could consider the testimony of Richard Anzalone. The parties agree that the court should have given a limiting instruction after the jury heard that Anzalone—an indicted co-conspirator of Barnes and Hosseinipour—had pled guilty to conspiracy to commit securities fraud. A co-conspirator's guilty plea is not admissible as substantive evidence of a defendant's guilt. *United States v. Benson*, 591 F.3d 491, 498 (6th Cir. 2010). When a guilty plea is introduced, the district court must instruct the jury that it may use that plea "only to determine the testifying witness's credibility." *United States v. Sanders*, 95 F.3d 449, 454 (6th Cir. 1996); *see also* Fed.

R. Evid. 105.  A court errs if it fails to give that instruction.  *United States v. Modena*, 302 F.3d 626, 631-32 (6th Cir. 2002).

The government contends that the court's error here was harmless.  To show that an error was harmless, the government must demonstrate by a preponderance of the evidence that the error "did not materially affect the verdict."  *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015).  (Maike and Hosseinipour did not raise this issue at trial, so they bear the even-heavier burden of demonstrating plain error.  *See Puckett v. United States*, 556 U.S. 129, 135 (2009).)  We thus ask whether a jury would likely have convicted the defendants had the court given a proper instruction—not whether the jury would likely have convicted the defendants without Anzalone's testimony at all.  *See Kotteakos v. United States*, 328 U.S. 750, 764-66 (1946).  Hence the inquiry focuses on whether the jury likely used the testimony for the improper purpose of inferring guilt by association.  Although the risk that a jury will assume such guilt is present whenever a testifying co-conspirator has pled guilty to the same conspiracy in which the remaining defendants are charged, "much of this potential for prejudice is negated when the pleading codefendant . . . testifies regarding the specific facts underlying the crimes in issue."  *United States v. Christian*, 786 F.2d 203, 214 (6th Cir. 1986).

Here, Anzalone's guilty plea was mentioned twice during the government's case.  First, the government's opening statement said that Anzalone—whom the prosecutor called Hosseinipour's "partner in this crime"—had already pled guilty "in this case."  Later, the government began its direct examination of Anzalone by asking him whether he had pled guilty to conspiracy to commit securities fraud.  He said that he had.  The prosecutor then asked Anzalone whether he had "also commit[ed] the crime in Count 1, the conspiracy to commit mail fraud."  Anzalone replied, "I believe so, now that I understand it."  Anzalone then proceeded to testify for

6

four days about how I2G marketed Emperor packages, what he and Hosseinipour told prospective distributors, and how much money he and other distributors made from the scheme.

Anzalone's testimony provided an insider's perspective on how I2G defrauded its distributors. Throughout his testimony, the government displayed emails between defendants as well as agendas and videos from promotional events, and Anzalone explained how that evidence fit into I2G's fraudulent scheme. For example, Anzalone testified that I2G's events lured potential investors by emphasizing the casino: "[T]he exciting part of [I2G] was, and what got us going, was the rev—the, excuse me, profit sharing of the—of the casino. That's what really got the program going. . . . [M]any people believed, you know, I get—I need to get as many shares as possible, because this thing could be huge." Anzalone also demonstrated the sales pitch he used when selling distributor packages, which was based on an I2G PowerPoint presentation. While demonstrating his sales pitch, Anzalone described how he misled potential distributors about both the features and the availability of the I2G Touch: "It had many, many different features. I would talk about the features it had. A lot of which never worked." These statements illustrated the deception at the core of I2G's marketing strategy. Anzalone's guilty plea thus bore only on his credibility and his motivation to testify.

Moreover, the court gave the jury some instructions that focused on Anzalone's credibility. Specifically, the instructions pointed out that the government had agreed to recommend that Anzalone receive a reduced sentence "in exchange for his cooperation." The court then told the jury to "consider Richard Anzalone's testimony with more caution than the testimony of other witnesses" and to consider whether it "may have been influenced by the government's promise." The court also instructed the jury that it must reach an independent conclusion about each defendant's guilt and should "not let the possible guilt of others influence [its] decision in any

way." In the end, both the nature of Anzalone's testimony and the court's other instructions to the jury provide "fair assurance" that the district court's failure to give a specific limiting instruction about Anzalone's guilty plea did not materially affect the jury's verdict. *Kotteakos*, 328 U.S. at 765. We therefore hold that the court's error in failing to give this instruction was both harmless and not plain.

D.

The defendants also raise several issues related to the indictment.

1.

Barnes and Hosseinipour argue that the district court lacked jurisdiction in these cases because the mail-fraud indictment failed to allege that they had a specific intent to defraud. Indictments must contain the elements of the charged offense along with enough facts to put defendants on notice of the charges against them so that they can mount a defense. *See Hamling v. United States*, 418 U.S. 87, 117 (1974). But an indictment that charges a conspiracy need not allege "with technical precision" the elements of the underlying crime that is the object of that conspiracy. *United States v. Superior Growers Supply*, 982 F.2d 173, 176 (6th Cir. 1992). Here, the indictment alleged that the defendants had "knowingly conspire[d]" to commit mail fraud and that they had committed various overt acts to further that conspiracy. Those overt acts—such as causing the purchase of Emperor packages on various dates listed in the indictment—gave the defendants ample notice of the charges against them. *See United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007). Hence the district court had jurisdiction.

2.

Maike argues in the alternative that his indictment was either constructively amended or suffered from a prejudicial variance. Both implicate his Fifth Amendment grand-jury right and

8

protections from double jeopardy, as well as his Sixth Amendment right to be informed of the charges against him. *United States v. Sittenfeld*, 128 F.4th 752, 775 (6th Cir. 2025).

Maike's arguments center on the jury instructions. The indictment, Maike says, referred only to a pyramid scheme, while the jury instructions permitted the conviction to rest on unindicted conduct—a general theory of fraud. In this way, he contends the instructions broadened the possible bases of liability. Maike did not raise this objection at trial, so we review it only for plain error. *United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008).

A constructive amendment occurs when an indictment remains literally unchanged, but its terms are altered because "events at trial raise a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *United States v. Kettles*, 970 F.3d 637, 648 (6th Cir. 2020). One way to constructively amend an indictment is if the instructions effectively charge the jury on a "separate offense that was not listed." *Kuehne*, 547 F.3d at 685. But when the "instructions alone differ from the indictment to charge a different *means* for committing the same crime, a mere variance occurs and a defendant must demonstrate prejudice." *Sittenfeld*, 128 F.4th at 775. Prejudice in this context means the defendant's "substantial right[s]" were affected. *Id.* at 784 n.19.

To evaluate whether the government erred, we read the indictment "as a whole." *Id.* at 781. This means we can look to the "introductory allegations," the "scheme and artifice to defraud" that the indictment describes, and the substantive counts. *United States v. Bradley*, 917 F.3d 493, 503 (6th Cir. 2019). Together, these are the government's "specification of the ways in which the defendant[] sought to accomplish" his crime. *Id.* And for the same reason they delimit the relationship between the indictment, the proper jury instructions, and an impermissible alteration.

Here, Maike's arguments hinge on a fundamental misreading of the indictment. In total, it refers to a pyramid scheme twice in its 22 pages—both in the introductory allegations. By contrast, the "scheme and artifice to defraud" describes a general theory of fraud, including how the defendants made misleading statements, concealed material facts, and lied about the company's potential. No constructive amendment occurred. *See Kettles*, 970 F.3d at 648.

3.

For the same reason, no prejudicial variance occurred either. Mail fraud does not, as Maike asserts, come in an "ordinary" variety that is distinct from a "pyramid scheme" variety. The core of the offense is a "scheme and artifice to defraud." Here, the indictment had an entire section so labeled; that section never limited its scope to pyramid schemes. True, one way for the jury to find that the defendants had devised a scheme to defraud was to find that the defendants had established a pyramid scheme, and the government presented sufficient evidence for the court to instruct the jury about what constitutes a pyramid scheme. The instructions cannot have departed from the means alleged in the indictment if the instructions reflected two legally equivalent options; juries may convict on any theory that an indictment fairly raises. *See United States v. Robinson*, 99 F.4th 344, 366 (6th Cir. 2024).

E.

We make shorter work of the defendants' remaining common arguments.

All three defendants challenge various rulings that admitted testimony from the government's expert witness, William Keep, and excluded testimony from their expert, Manning Warren. Keep's testimony both "rest[ed] on a reliable foundation"—his expertise in multilevel marketing and his scrutiny of I2G—and was "relevant to the task" of evaluating I2G's business practices. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993). Meanwhile,

Warren did not establish that he had expertise regarding pyramid schemes. Hence the court did not abuse its discretion by limiting Warren's testimony to securities regulation, where he had demonstrated expertise. *See id.* The court did not abuse its discretion on these points.

The defendants next raise six challenges to the admission of testimony from the government's lead case investigator, Agent Dave McClelland. They first contend that two summary charts he presented lacked foundation. *See* Fed. R. Evid. 1006. The government concedes that those charts—Exhibits 230 and 232—should not have been admitted, because some of the evidence they summarized had not been admitted. But the record shows no reasonable probability that these charts affected the jury's verdict, so that error was harmless. *See United States v. Agrawal*, 97 F.4th 421, 429 (6th Cir. 2024).

The defendants next contend that evidence of Barnes's foreign bank account was irrelevant. *See* Fed. R. Evid. 401. But the potential location of fraudulent proceeds could bear on the fraud's extent or nature, so we agree with the district court that the evidence was relevant. *See United States v. Streebing*, 987 F.2d 368, 375 (6th Cir. 1993).

That leaves four hearsay objections to parts of McClelland's testimony. *See* Fed. R. Evid. 802. First, the defendants challenge McClelland's testimony about what motivated distributors to purchase Emperor packages. That testimony was hearsay. But the participants themselves testified at trial to the same facts, so any error from admitting McClelland's similar testimony was harmless. *See United States v. Martinez*, 588 F.3d 301, 313 (6th Cir. 2009). Second, the defendants object to the admission of an email from one of the original I2G partners about his plans to leave the company. But that email revealed the partner's present state of mind—that health and family reasons motivated his departure from I2G—so it falls within an exception to the rule against hearsay. *See* Fed. R. Evid. 803(3). Third, the defendants object to McClelland's

testimony that an employee of Plus-Five Gaming (which ran I2G's online casino) "provided an answer" to his question about the company's invoices. But that statement was not offered for its truth because McClelland stated only that the employee "provided an answer," not what that answer was—the statement thus not hearsay at all. *See* Fed. R. Evid. 801(c). Finally, the defendants object to McClelland's identification of the I2G participants whose initials appeared in the indictment. But that identification involved no out-of-court statements at all, so it too was not hearsay. *See id*. We therefore reject these challenges to Agent McClelland's testimony.

Barnes and Hosseinipour also assert that the government introduced false evidence, which (they say) violated their due-process right to a fair trial. The government may not knowingly present false evidence. *Miller v. Pate*, 386 U.S. 1, 7 (1967). To show that false evidence tainted a jury's verdict, a defendant must demonstrate that evidence was both false and material and that the government knew of its falsity. *United States v. Fields*, 763 F.3d 443, 462 (6th Cir. 2014). Here, the defendants contend that testimony based on Exhibit 101i—a spreadsheet containing I2G participants' earnings and losses—was false. That spreadsheet provided the basis for the government's expert witness, William Keep, to testify that 96 percent of I2G's distributors lost money. But the government elicited testimony from a computer programmer who compiled the spreadsheet, Jerry Reynolds, about the spreadsheet's limitations. Specifically, Reynolds testified about the very deficiency to which the defendants point: that the spreadsheet might not have included every payment that I2G made to participants, so it might overstate how many participants lost money. Moreover, the defendants had ample opportunity to cross-examine both Keep and Reynolds about anything that the spreadsheets contained. *See United States v. Ward*, 190 F.3d 483, 491 (6th Cir. 1999). No due-process violation occurred.

12

Finally, Barnes argues that the government violated *Brady* and the Jencks Act when it failed to disclose a memorandum that summarized an interview with Hosseinipour that IRS agent Matt Sauber had conducted in March 2022. *See Brady v. Maryland*, 373 U.S. 83 (1963). A *Brady* violation occurs when government suppresses material evidence that is favorable to the defendant. *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). In the interview at issue here, Hosseinipour told Agent Sauber that she had believed and had relied upon various statements by Maike, that she did not know what the casino's actual profits were, and that she believed the casino had long-term potential. If anything, these statements illustrate the fraud that permeated the scheme, which would have been unfavorable to Barnes. No *Brady* violation occurred. Nor did the failure to disclose the memorandum violate the Jencks Act. *See* 18 U.S.C. § 3500. The Jencks Act requires the disclosure only of witness statements that relate to the subject of the witness's testimony. *United States v. Susskind*, 4 F.3d 1400, 1404 (6th Cir. 1993) (en banc). But Sauber did not testify about any statements covered in the memorandum, so the Jencks Act does not apply.

F.

Apart from his conviction, Barnes argues that his sentence was procedurally unreasonable. A court commits procedural error if it calculates a sentencing-guidelines range incorrectly. *Gall v. United States*, 552 U.S. 38, 51 (2007). We review a guidelines calculation for an abuse of discretion and the court's underlying factual findings for clear error. *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013).

Barnes first argues that the court overestimated the amount of economic loss that occurred through the conspiracy. Under § 2B1.1(b) of the sentencing guidelines, if a crime causes economic loss of greater than $25 million, a 22-level sentencing enhancement applies. The Sentencing Commission's Guidelines commentary explains that loss is the "greater of actual loss or intended

loss." USSG § 2B1.1 cmt. n.3(A). Barnes contends that the ordinary meaning of "loss" does not cover "intended loss," but our court has held otherwise. *See You*, 74 F.4th at 397-98. Here, over the life of the scheme, I2G sold some 5,300 Emperor packages (though as noted elsewhere it never had more than 5,000 Emperors at any one time). The district court, for its part, estimated the intended loss by multiplying 5,000 Emperor packages by $5,000. That $25 million—along with the monthly fees that Emperors were required to pay—easily puts the intended economic loss of the Emperor program above $25 million. The district court thus made a "reasonable estimate" of the intended economic loss, which is all the guidelines require. *See United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013). Barnes also contends that the court erred by failing to offset the value of the products that Emperors received against the $25 million loss estimate. But the evidence showed that those products were mostly worthless. The district court's intended-loss calculation was not clearly erroneous.

Barnes next argues that the district court lacked sufficient evidence to apply a four-level sentencing enhancement for causing "substantial financial hardship" to at least five victims. *See* USSG § 2B1.1(b)(2). The guidelines define such hardship to include, among other things, "substantial loss" of one's retirement savings, "substantial changes" to one's living arrangements, and "substantial harm" to one's ability to obtain credit. USSG § 2B1.1, cmt. 4(F). Here, victim-impact statements made clear that I2G caused dozens of people to lose their life savings, their ability to pay rent, or their ability to obtain a mortgage. The district court thus did not clearly err when it concluded that I2G had caused substantial financial hardship for at least five victims.

In any event, the district court flatly rejected the sentencing guidelines' usefulness in determining Barnes's sentence. At Barnes's sentencing hearing, the court said that the guidelines range of 262 to 327 months was "grossly disproportionate" and called the guidelines "not helpful

in calculating" Barnes's sentence. Instead, the court based Barnes's sentence on Maike's ten-year sentence, and concluded that an eight-year sentence would be "proportional" for Barnes. Barnes's deteriorating health led the court to go even lower. Concerned that eight years might turn out to be a life sentence, the court sentenced Barnes to 48 months—about one-sixth the length of the original guidelines range. Any minor errors in the calculation of that range thus would have been harmless anyway.

## G.

Hosseinipour separately argues that her attorney was constitutionally ineffective. After the jury announced its verdict, Hosseinipour—through a new attorney—moved for a new trial based on an alleged violation of her Sixth Amendment right to counsel. *See* Fed. R. Crim. P. 33. We review the denial of a motion for a new trial for an abuse of discretion. *See United States v. Anderson*, 76 F.3d 685, 692 (6th Cir. 1996). A district court abuses its discretion "when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law." *United States v. White*, 492 F.3d 380, 408 (6th Cir. 2007).

Rule 33 permits a court to grant a defendant's motion for a new trial when the "interest of justice so requires." *See* Fed. R. Crim. P. 33(a). A Sixth Amendment violation "clearly meets this standard." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). To establish that counsel was constitutionally ineffective under the Sixth Amendment, a defendant must show two things. First, she must show that her attorney's performance "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Second, she must prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Here, Hosseinipour offered sworn affidavits that alleged various deficiencies in the performance of her attorney, Wayne Manning (who is also her brother-in-law). Those affidavits recited that, at trial, Manning had failed to make various objections, or to impeach certain witnesses. But we agree with the district court that the record shows no prejudice to Hosseinipour at trial. Among other things, counsel for Hosseinipour's co-defendants—whose interests largely aligned with her own—ably represented their clients' interests through objections and motions throughout the trial, which served Hosseinipour's interests too.

That leaves Hosseinipour's claim that Manning's pre-trial representation was ineffective. She emphasizes three points. First, she alleges that Manning never told her about the elements of the charges against her or about her range of possible sentences. Second, she alleges that Manning breached the attorney-client privilege by disclosing her defense strategy to the government and to her co-defendants. Third, she alleges that Manning told her she would be committing perjury if she accepted the government's offer of a plea deal—which allegedly would have come with a recommendation of no jail time. She further alleges that she would have accepted the deal had Manning not given her bad advice.

The district court chose not to hold an evidentiary hearing about these allegations, and instead denied Hosseinipour's motion based on its own "recollection of the trial and the record." Yet that recollection was mistaken in at least one respect. Specifically, the court's order described a pre-trial colloquy in which, the order said, Hosseinipour had acknowledged that she discussed the plea offer with her attorney. The court also recalled, mistakenly, that Hosseinipour had said she understood the penalties she was facing and that she "had knowingly chosen to proceed to trial notwithstanding the potential risks." But that colloquy never happened. The court's denial of Hosseinipour's motion thus rested on a factual finding that was clearly erroneous, and she had no

opportunity to correct that finding through an evidentiary hearing. Hence we must vacate the district court's order.

On remand, the district court can exercise its discretion as to whether to hold an evidentiary hearing about Manning's pre-trial performance. *See United States v. Bass*, 460 F.3d 830, 838 (6th Cir. 2006). The parties can also address whether a motion for a new trial under Criminal Rule 33 is a proper means to seek relief for allegedly ineffective pre-trial assistance. *See generally Lafler v. Cooper*, 566 U.S. 156, 171-72 (2012). In this appeal, we hold only that the district court's denial of the motion rested on a clearly erroneous factual finding, which was an abuse of discretion.

## H.

Maike challenges his convictions—as well as an order that he pay restitution—on several other grounds. Initially, we consolidated his appeal only with respect to issues common to Barnes and Hosseinipour. But with the benefit of supplemental briefing from Maike and from the government, we now address Maike's remaining arguments here.

## 1.

Maike argues that the court abused its discretion by admitting an IRS agent's testimony, which Maike says fell outside the scope of the government's pretrial disclosure. We review the admission of evidence for an abuse of discretion. *United States v. Jenkins*, 593 F.3d 480, 484 (6th Cir. 2010). Under the version of Criminal Rule 16 in effect at the time relevant here, the government was required, upon the defendant's request, to provide a summary of any expert testimony that it intended to offer at trial. Fed. R. Crim. P. 16(a)(1)(G) (2013). If the government failed to do so, a district court had discretion to grant a continuance or to prohibit admission of the undisclosed evidence. Fed. R. Crim. P. 16(d)(2) (2013).

The disclosure here concerned the government's allegation that Maike had evaded taxes by underreporting his income. Specifically, the government alleged that Maike had laundered some of his I2G income into loans from an I2G affiliate, which he then used to purchase two farms in Kansas. Accordingly, the government disclosed that Paula Basham—an experienced IRS agent and auditor—would "explain the unsurprising conclusion that if Maike had included the Kansas land purchases on his taxes, he would have had tax due."

At trial, Maike objected to a line of questions that, in his view, fell outside this disclosure. The government had asked Basham about potential "red flags" that the IRS would use to determine that an instrument "may look like a loan, but [is] not actually a loan." Basham testified that those indicators could include a lengthy repayment term, a below-market interest rate, no security, and other indicators that the transaction was not conducted at arm's length. She also testified that Maike's loans for the Kansas farms had these red flags. Maike now argues that this testimony was expert testimony that—in violation of Rule 16—the government failed to disclose.

But any such nondisclosure was harmless. The district court's colloquy with Maike's attorney—after he objected to this testimony—showed that he was prepared to address all these issues on cross-examination. And during cross Maike's counsel capably did so. Nor, on appeal, does Maike present any serious argument that he was prejudiced by the nondisclosure. Any error in admitting Basham's testimony was therefore harmless. *See United States v. Tarwater*, 308 F.3d 494, 516 (6th Cir. 2002).

2.

Maike argues that the government violated *Brady*. Maike's accountant, Mike Pierce, testified during the government's case-in-chief at trial. After Pierce's direct examination, the government provided Maike's counsel with an FBI 302 record of agents' notes from their

interview with Pierce. Those notes included a statement by Pierce that Maike "never refused to give me anything, and whenever I asked for a backup document, he gave it to me." Although the government probably should have provided that statement to Maike's counsel sooner, Maike has not shown how that delay was material in the *Brady* sense. *See Jalowiec v. Bradshaw*, 657 F.3d 293, 306-08 (6th Cir. 2011). The statement itself was simple, and Maike's counsel had ample time to prepare his cross-examination of Pierce on that point. No *Brady* violation occurred. *See United States v. Presser*, 844 F.2d 1275, 1283-84 (6th Cir. 1988).

3.

Maike also argues that the district court's jury instruction on the "advice-of-accountant" defense misstated the relevant law. Suffice it to say we disagree.

4.

Maike challenges the district court's order that he pay $5.2 million in restitution. Under the Mandatory Victims Restitution Act, a district court must order restitution for "any offense committed by fraud or deceit" in which an identifiable victim suffered a loss. 18 U.S.C. § 3663A(c)(1)(A)(ii). We review a district court's restitution calculation for an abuse of discretion. *United States v. Sawyer*, 825 F.3d 287, 292 (6th Cir. 2016).

Here, the district court's restitution order had two components: one required Maike to pay restitution to victims of I2G; the other required him to pay the government amounts that he had evaded paying in taxes. Maike contends that the restitution order failed to account for refunds that I2G had previously paid to some distributors. But none of those distributors are among the 434 victims to whom the district court ordered that Maike pay restitution. And we are satisfied that the district court's calculation of that component of its order represents a reasonably precise estimate, which is all that the statute requires. *See Kilpatrick*, 798 F.3d at 388.

Maike likewise challenges the amount he owes to the government for tax evasion. The court ordered Maike to pay the government $936,540—which was 39.6 percent of the $2.3 million loan that he failed to report as income. Suffice it to say Maike had not shown any error in that determination.

\* \* \*

As we recited in our published opinion, the defendants' criminal judgments are affirmed; except that we vacate the district court's December 29, 2022, order denying Hosseinipour's motion for a new trial. We remand her case to the district court for the limited purpose of deciding that motion anew, consistent with our decision here.